**Hull Hopson Richardson FRANKLIN et al.**

**v.**

**The QUITMAN COUNTY BOARD OF EDUCATION et al.**

**No. DC 679.**

United States District Court
N. D. Mississippi,
Delta Division.
July 29, 1968.

Iris Brest, Jackson, Miss., Louis R. Lucas, Memphis, Tenn., for plaintiffs.

Ney M. Gore, Jr., Partee L. Denton, Marks, Miss., John E. Stone, Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This case, in its present posture, relates to construction of new school facilities in Quitman County, Mississippi. By Section VII of a plan of desegregation for the 1967–68 school year ordered by this court on August 29, 1967, the County Board of Education was required to locate and construct any new school "with the objective of eradicating the vestiges of the dual system". On October 13, 1967, the Board filed a report proposing to abolish four high schools within the district located at Sledge, Crowder, Marks and Lambert, to construct a high school attendance cen-

ter near Marks, said to be the center of the district's school population, and to obtain funds for such purpose by requesting the qualified voters of the school district to approve a bond issue, and also by requesting a grant from the State Educational Finance Commission. No order approving this plan was entered by the court, nor was formal objection thereto immediately made.

On November 7, 1967, the County Board of Education adopted a resolution reciting that it was necessary to borrow funds in an amount not exceeding $500,000 for the purpose of "erecting school buildings and related facilities and purchasing land therefor" and requesting the Board of Supervisors of Quitman County to call an election of the qualified voters of the district to determine whether or not such bonds might be approved. The Board's resolution also recited that an estimate of the total cost of construction, including land purchase, was $775,000, of which $275,000 would be paid by grant from the State Educational Finance Commission and the balance to be paid from the proceeds of the bond issue. On November 10, 1967, the Board of Supervisors adopted a resolution adjudicating the essential legal requirements and ordering the calling of a special election. Neither of the resolutions adopted by the County Board of Education or the County Board of Supervisors, nor the proposal submitted to the voters limited the question to the acquisition of land for, and construction of, a county-wide high school; rather they were each cast in general terms for erecting, repairing and equipping school buildings and related facilities, including the purchase of land therefor.

On December 12, 1967, an election was held. More than three-fifths of the qualified electors voting in the election voted in favor of the bond issue, and the Election Commissioners so certified to the Board of Supervisors. On January 2, 1968, the Board of Supervisors adopted an order finding all jurisdictional facts required by law and directing the issuance of bonds of $500,000 on behalf of Quitman County School District. On January 2, 1968, The County Board of Education applied to State Educational Finance Commission for a grant of $275,000, which was approved in due course. On January 22, 1968, the County Board of Education executed a sixty day option contract for the purchase of a proposed site for a new school, to be constructed as a county-wide high school.

On February 15, 1968, the County Board of Education filed its motion in this court requesting formal approval of the proposed construction of the new high school attendance center, and plans and specifications were exhibited therewith.

On February 21, 1968, plaintiff, for the first time, expressed their formal opposition to the proposed construction by filing written objection in this court, asserting that the construction of a county-wide new high school attendance center would perpetuate a segregated school system in that the new high school would be attended predominantly by white pupils while the all-Negro Quitman County High School, also at Marks, would continue indefinitely as a Negro school, and specifically the proposed location of the new high school, if it were to operate under a freedom-of-choice pupil attendance plan, would preserve, if not actually increase, segregation within the district. On March 22, 1968, the school site option expired, with the Board of Education having taken no action to exercise or extend it. On March 23, 1968, the Educational Finance Commission was notified that the site option had expired, and on March 26, 1968, it revoked its $275,000 grant. On April 1, 1968, the Board of Supervisors adopted a resolution rescinding and revoking its prior resolution for the issuance of bonds. This action was not requested in any manner by the Board of Education, nor was it advised that the Board of Supervisors intended to rescind the bond issue.

On May 7, 1968, plaintiffs filed a supplemental complaint adding as defen-

dants the Board of Supervisors of Quitman County, the Mississippi State Educational Finance Commission, sued as a "state agency", and T. H. Naylor, Jr., individually and as Executive Secretary of the State Educational Finance Commission. By this pleading plaintiffs urged that the Board of Supervisors be required to issue and sell bonds in accordance with its resolution of January 12, 1968, and that the Educational Finance Commission be required to reinstate its grant so as to permit the construction of "a consolidated secondary school" in Quitman County. Plaintiffs also moved for a preliminary injunction to order the Board of Supervisors to refrain from invalidating or delaying the issuance of school bonds and to require it to issue and sell the bonds in accordance with its prior order, and that Educational Finance Commission be enjoined from taking any action to prevent the grant of $275,000 to Quitman County School Board and to withhold approval and issuance of all other grants, loans or advances until the grant first be made to Quitman County. On May 17, 1968, the County Board of Education filed its motion to dismiss as moot all motions dealing with proposed construction of a high school attendance center for the reason that the option upon the proposed school site acquired by it had lapsed and the site was no longer available, and also because of the actions of the Board of Supervisors of Quitman County in rescinding the $500,000 bond issue and of the State Educational Finance Commission in withdrawing the $275,000. Quitman County Board of Supervisors answered, admitting the facts as to the school bond financing and its rescission of the bond issue. On May 27, 1968, plaintiffs filed another motion to require, insofar as relates to school construction, newly added defendants, State Educational Finance Commission and T. H. Naylor, Jr., to assist the County Board of Education in the preparation of a new survey of educational needs and long range plans designed to eliminate a segregated school system.

Upon a hearing, Thomas H. Naylor, Jr. was dismissed as a party defendant, and the court required the joinder of the individual members of the State Educational Finance Commission as defendants, on the ground that they were the parties subject to suit and State Educational Finance Commission possessed no suable corporate capacity. On June 19, 1968, the members of the State Educational Finance Commission, thus joined, filed their motion to dismiss for failure to state a claim, final action on which was deferred after an evidentiary hearing on July 12, 1968. At the same time the court overruled a motion by plaintiffs to amend their complaint to sue on behalf of all Negro school children in the state, the court concluding that, in view of the posture of the case from its beginning, the litigation should be confined to the school children and school facilities of the Quitman County School District.

There converge upon the court at this time rulings upon the following motions: (1) motion of County Board of Education for dismissal on the ground that the issues presented are moot; (2) motion of members of the State Educational Finance Commission to dismiss for failure to state claim upon which relief can be granted; and (3) motion of plaintiffs for injunctive relief for specific school construction or such alternative relief as might be proper.

The essential facts are largely stipulated and many have been incorporated in the recital heretofore made. After the bond election had carried and the Board of Supervisors approved the bond issue, the County Board of Education obtained an option upon 25 acres of land adjacent to the city limits of Marks as a site. The purchase price was $47,550 to be paid in cash upon delivery of deed and $2,500 was paid as consideration for the option. In case of exercise of the option this sum was to be applied against the purchase price. The option was allowed to expire within 60 days from its date and it did not provide any method of extension. The County Board

of Education made an effort to get the option extended but the landowner was agreeable to an extension only if paid at a rate of $42 for each day of the extension, with such daily payments to be applied to the purchase price. Later, and before any of the motions could be heard, the land was planted to crops and is presently unavailable. Upon being advised that the proposed site for the new school was no longer available, the Educational Finance Commission cancelled its grant of $275,000 and proceeded to honor applications pending by other school districts whose demands far exceeded funds then available. However, this was a temporary situation only and by the time of the hearing before this court on July 12, 1968, the Commission had available funds sufficient for it to honor the school construction credit due Quitman County. In fact, this credit, calculated in accordance with a statutory formula,[1] is now increased to about $290,000. These funds will be available to Quitman County School District for new or expanded school construction upon an application of the County Board of Education submitted to, and approved by the Commission for a need established in accordance with the Commission's criteria, which are unrelated, as previously mentioned, to racial, or desegregated, considerations. Once the option on the school site expired, the County Board of Education has not taken further action of any kind, nor has it notified or requested the Board of Supervisors to rescind, or attempt to cancel, the bond issue approved by the voters of the district. The strong probabilities shown by the record are that the voters would not have approved the bond issue except upon an implicit understanding that the funds were to be used to construct a consolidated county-wide high school, to

operate on a freedom-of-choice principle. The new school was planned to accommodate 770 pupils, grades 9–12. Students in those grades (520 whites and an anticipated 40 Negroes) would have been moved from the four small previously all-white high schools. A measure of future growth had also been taken into account in planning the proposed new building, and school officials concluded that the new high school would contain "adequate room for any Negroes that chose to come to that school". Quitman County High School, also located at Marks, was constructed in 1958, maintaining grades 8–12, and attended by approximately 930 Negro (and no white) students.

Quitman County School District was reorganized in December, 1956, and at that time the school facilities of the district were planned upon a survey of long-range building needs made the previous year by professional advisers from the University of Mississippi. This survey had been premised upon the development and use of racially segregated school buildings "by legal means", and had outlined a construction program for providing separate, but equal, educational facilities for children of the white and Negro races. Central features of the plan, resulting from this survey, contemplated the construction of two county-wide high schools, one to serve white children and the other for Negro children. In 1957 this long-range plan was submitted to Educational Finance Commission and the following year the Commission approved the construction of the Quitman County High School, granting funds for that purpose. Quitman County High School has always been a wholly Negro-attended school. At no time has the County Board of Education ever revised or sought in any

1. § 6247–03 Miss.Code Ann. provides for annual grants to be made from the "state public school building fund" in accordance with a formula based upon an annual contribution of $12 for each child in average daily attendance in the public schools during each school year, increased by an additional annual contribution of $3 for

each Negro child in average daily attendance during each school year through the 1967–68 school term. These grants may be used only to establish and maintain adequate school physical facilities and each school district is entitled to a vested credit.

way to modify the original plan adopted approximately 12 years ago. The proposed construction of a second county-wide high school, to be located near the center of the county school population, was in fulfillment of an essential part of the original survey, the validity of which was accepted by Educational Finance Commission without question.

Since its organization in 1954, Educational Finance Commission has contributed nearly $125,000,000 to local school districts in the state for school expansion and new construction. State aid has contributed substantially to new school buildings throughout the state, such contributions ranging from 18% of total cost in the low year to more than 50% for the average of the first seven years of the Commission's existence. Funds for this purpose are made available to the Educational Finance Commission through State School Bonds issued by the State Bond Commission, subject to a statutory limit of $80,000,000. At the present time, approximately $68,-000,000 of those State School Bonds are outstanding. Despite the vast scope of its financial operations, the Commission has a limited budget and staff inadequate for initiating and promulgating school surveys for school districts and has restricted its activities in that regard to approval or disapproval of such long-range plans and other needs as are submitted by local school interests.[2] The basic policy of the Commission, since its creation, has been to provide equal facilities for schools voluntarily attended by students of one or both races. In 1966 it discontinued the designation of "white" and "Negro" school construction, and it no longer takes into account the racial makeup or composition of any particular school for which a construction-aid application is made. It is guided only on the basis of need shown for the number of classrooms at each project based upon school population. To this date, it has disclaimed responsibility for planning new school facilities with an eye toward disestablishing a dual school system and views desegregation of the public schools as altogether a problem of school operation for the local school district to resolve.

After adopting a freedom-of-choice plan in January, 1966, Quitman County School District filed a compliance form with the Department of Health, Education & Welfare, and received federal aid, which was terminated for noncompliance the following year. Prior thereto, the school system had operated as a segregated, dual system. For the 1966–67 school year, the period having the latest available accurate figures, there were enrolled in the district's public schools about 5300 students, of whom 3594 were of the Negro race and 1708 were of the white race. The district maintains eight attendance centers. Four of these continue to be all Negro-attended, namely: (1) Southside Elementary School in Lambert, with 748 students in grades 1–7; (2) Westside Elementary School in Marks, with 995 students in grades 1–7; (3) Falcon Elementary School in Falcon, with 722 students in grades 1–7; and (4) Quitman County High School in Marks, with 963 students in grades 8–12. The other four attendance centers are predominantly white schools, which are also located throughout the county, namely: (1) Crowder High and Elementary School in Crowder, grades 1–12, attended by 363 students, all of whom are white except 2, who are not Negro but probably Chinese; (2) Lambert High and Elementary School in Lambert, grades 1–12, attended by 542 students, all of whom are white except 24 Negroes

---

2. § 6246–01 Miss.Code Ann. proclaims a legislative policy that "the maintenance of the uniform system of free public schools to insure and provide substantial equality of educational opportunity *is the joint responsibility of the State of Mississippi and the local taxing units thereof.*" And by § 6246–11, the duties of the Commission, inter alia, are to approve, or disapprove, "all surveys of educational needs made by any school board or board of education" and it *"may assist such boards in making such surveys, and may make supplemental surveys of such needs."* (Emphasis added)

and 16 others, probably Chinese; (3) Sledge High and Elementary School in Sledge, grades 1–12, attended by 275 students, all of whom are white except 13 Negroes and 7 other non-whites; and (4) Marks High and Elementary School in Marks, grades 1–12, attended by 719 students, of whom 134 are Negroes. In the high school grades (9–12) the formerly all-white schools had enrolled 24 Negro students distributed as follows: 15 at Marks, 0 at Crowder, 5 at Lambert and 4 at Sledge. There is a limited increase in the number of Negro students signifying an intention to enroll in these grades of the predominantly white high schools for the next school year, 1968–69, but no white students have chosen to attend the all-Negro Quitman County High School.

By its motion to dismiss, the County Board of Education urges that all pending matters have now become moot due to loss of the site option and abandonment of the proposed construction. This ignores the fact that there exists a real controversy between the parties as to the adequacy of a plan, conforming to controlling federal constitutional requirements, for the disestablishing of state-imposed segregation in the construction of new and additional school facilities. The uncontradicted evidence shows that the long-range plan of school construction, by which the County Board of Education has been guided, was conceived in a policy of segregation which offends constitutional rights of Negro children; therefore, that plan must be condemned. It will not satisfy the legal obligations resting upon the County Board of Education for it merely to shelve an old plan which can no longer be followed, and do nothing more. On the contrary, that Board must take affirmative steps to adopt a new long-range plan of school needs, including additional construction, which will insure the achievement of a biracial, unitary school system. Since it is self-evident

that new school buildings will affect the pattern of school enrollment for years to come, their actual construction must be preceded by study, analysis and intelligent planning, consistent with the objective of eradicating a dual system. Controlling federal decisions now require the County Board, in making its future plans, to consider the race of students and take steps to bring about constitutionally required integration. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716, May 27, 1968, decision; United States v. Board of Public Instruction of Polk County, 395 F.2d 66, 5 Cir. April 18, 1968, decision. In *Polk County*, it was held that the school board, in planning the construction of a new school, was obligated to "seek means to eradicate the vestiges of the dual system" except where inconsistent with "the proper operation of the school system as a whole". Presently being without such a plan, Quitman County School District is obliged to come forward with one and to take all practicable steps within the financial capabilities of the District, for the carrying out of a constitutional plan, consistent with the District's legitimate educational objectives. According to the evidence, there exist within the state survey specialists or consultants who are qualified and competent to aid the County Board of Education in its determination of long-range building needs and to assist in the gathering of data upon which to base specific recommendations. The making of a comprehensive survey would require as much as three or four months.[3] The County Board of Education should be free, in the exercise of sound discretion, to promulgate a plan in keeping with what it deems to be the proper educational objectives for the school children in its charge, subject only to the constitutional command against racial segregation. The plan should, by all means, take into account the present availability of $500,000 pro-

3. A survey compiled in May, 1968, by Mississippi State University, consultants for the Pontotoc County Board of Educa-

tion, might well serve as a guide for Quitman County School District as it approaches the task at hand.

vided by local bond issue and a grant of $290,000 from Educational Finance Commission. There is no restraint of any kind upon the County Board of Education to use these funds only for a school which will operate upon a freedom-of-choice principle. At best, that method for determining school attendance is of limited duration; it has never been considered anything more than a transitional means to an end result of a unitary school system. Nor is the County Board of Education, in a contemplated use of these funds, limited to the idea of erecting a high school, or of a school to serve the entire county rather than a portion thereof. All aspects of the matter are open for the Board's consideration. The bond issue as submitted initially by the County Board of Education, voted upon by the voters, and authorized by the Board of Supervisors, was in general terms of "erecting, repairing and equipping school buildings and related facilities * * * and purchasing land therefor for the Quitman County School District". Whatever specific information may have been furnished to the voters as an influence upon their decision for passing the bond issue is not contractual or binding upon the County Board of Education, but only relevant to the public understanding of what was regarded as the District's desires. The County Board of Education may not be relieved of its duty to come forward with an acceptable long-range plan of building needs, based upon such professional advice as it may wish to employ to study the various facets of its school problems, including desegregation.

The court rejects the argument of plaintiffs that it should at this time order new school construction of some type despite the fact that the County Board of Education has heretofore proceeded only upon a plan regarded as duplicating existing nearby high school facilities and designed to perpetuate a maximum degree of high school segregation. The unavailability of the site previously selected has indeed rendered moot the only specific construction presently contemplated. With that plan repudiated by the court, there would be no way for it to know how or in what manner to command the County Board of Education to proceed forthwith with school construction. To do so would be an unseemly and unnecessary usurpation of the functions of the Board of Education. This court is presently without an informed judgment as to where one or more new schools ought to be located in Quitman County, or of what size a new school should be, or whether it should serve all or a portion of the county, or what grades such school ought to encompass. These and related matters are, necessarily, decisions primarily to be made by the County Board of Education. If it is to be exercised with comprehension, federal equity power, however broad it may be, must be invoked only with clarity and specificity akin to cases ordering specific performance of contract. Elemental justice requires that a defendant against whom equitable relief is ordered should be able to know exactly what is required for his compliance. We decline to exercise any power requiring immediate construction by the County Board of Education, as wholly inappropriate in the circumstances disclosed by this record.

The County Board of Supervisors unilaterally sought to cancel the voter-approved bond issue solely upon the ground, which was a misapprehension, that the $275,000 grant from Educational Finance Commission would not be forthcoming. The authority of the Board of Supervisors to issue school bonds, for and on behalf of Quitman County School District, is controlled by Miss.Code 1942 Ann. §§ 6531 et seq. as amended. Initiating action for school district bonds occurs under § 6532–04 either by the adoption of a resolution by the County Board of Education, or by petition of not less than ten per cent of the qualified electors of the school district. Where action is taken, the Board of Supervisors is required by that statute to adopt a resolution calling for an election to be held within sixty days to

submit to the voters the question of the issuance of school bonds. §§ 6532–05, –06, and –07 contain specific directions for notice of election, holding of election and certifying results of election. § 6532–07 further provides:

"Should three-fifths (3/5) of the qualified electors who vote in such election vote in favor of the issuance of bonds, then the board of supervisors * * * shall issue such bonds, either in whole or in part, within two (2) years from the date of such election, or within two (2) years after the final favorable termination of any litigation affecting the issuance of such bonds, as such board of supervisors * * * shall deem best."

By § 6532–10 of said Code, it is provided, in relevant part, as follows:

"However, in any case where the issuance of the bonds of a school district has been authorized under the provisions of this act, and at any time prior to the actual issuance and sale of said bonds, there should be filed with the board of supervisors * * * *a certified copy of a resolution adopted by the board of trustees of the school district on whose behalf the bonds are to be issued requesting either that the authority to issue said bonds be withdrawn and revoked or that the purpose or purposes for which the bonds are to be issued be amended, altered and changed,* in which latter case the resolution shall specify distinctly the amendment, alteration and change proposed, the board of supervisors * * * shall, within sixty (60) days after the receipt of such resolution, call an election to be held within the school district involved for the purpose of submitting to the qualified electors thereof the question of whether the authority to issue the bonds should be withdrawn and revoked or whether the purpose or purposes for which the bonds are to be issued should be amended, altered and changed, as the case may be. * * * If a majority of the qualified electors who vote in said election shall vote in favor of the proposition, and the proposition be to withdraw or revoke the authority to issue said bonds, then the authority to issue such bonds shall terminate; otherwise, the board of supervisors * * shall continue to have the power and authority to issue said bonds to the same extent as though such election shall not have been held. If a majority of the qualified electors who vote in said election shall vote in favor of the proposition, and the proposition be to amend, alter or change the purpose or purposes for which the bonds shall be issued, then the board of supervisors * * * shall be authorized to issue said bonds for the purpose or purposes as amended, altered and changed; otherwise, the bonds shall be issued for the purpose or purposes originally specified." (Emphasis added).

 Under Mississippi law the County Board of Supervisors is required to issue school bonds if it finds all the jurisdictional facts to exist for so doing, "since this statute [predecessor of § 6532–07] was enacted in the public interest, and it was not the intention of the Legislature that a board of supervisors may arbitrarily decline to issue bonds where such jurisdictional facts exist for their issuance", as held in Board of Supervisors of Quitman County v. State ex rel. Crisler, 205 Miss. 43, 38 So.2d 314, 316 (1949). In that case, the State Supreme Court clearly held that, once the basic jurisdictional facts shall have been adjudicated by the Board of Supervisors as regarding a bond issue, all that remains is a mere ministerial duty to proceed with the issuance of legally authorized bonds. It is true that the Supervisors do have a discretion of determining, within a two year period following an election, of when to issue the bonds and of fixing, subject to the maximum authorized, the amount in which such bonds are to be issued. This discretion was exercised by the Quitman County Board of Supervisors on January 2, 1968, when it adopted a resolution

issuing bonds in the full amount of $500,000, and to bear date of March 1, 1968. Its hurried attempt to cancel the bonds by resolution adopted April 1, 1968, ignored all procedures required by § 6532–10, as aforesaid, for either withdrawal of the bond issue or changing of purpose for which the bonds are to be issued. This purported revocation was fatally defective both procedurally and substantively, and violative of state law. Moreover, the Board of Supervisors may not act to defeat the constitutionally required obligations of the County Board of Education to plan for, and effectuate, facilities for a biracial, unitary school system. Indeed, this constitutional duty also rests upon the Board of Supervisors to the extent that it must cooperate with, and not impede, the County Board of Education in the fulfillment of its plans. Fear of a greater degree of school desegregation in the future cannot afford a permissible basis for any public body to abstain from doing its plain duty. It follows that the Board of Supervisors must set aside and expunge its order of April 1, 1968, purporting to cancel the $500,000 school bonds, and take no further action with respect thereto until the approval of a plan of new school facilities to be submitted by the County Board of Education.

■■ There remains for consideration the nature of the duty resting upon

Educational Finance Commission. It is, without doubt, an important agent in carrying out the State's beneficent policy for granting financial aid to local school districts to repair or construct buildings and other school facilities. It administers the State Public School Building Fund in accordance with Chapter 13 of the Mississippi Laws, 1953, Extraordinary Session, now Mississippi Code Annotated § 6347–21 et seq.; and the grants heretofore made by the Commission have had a profound state-wide effect upon the quality, size and location of new school buildings. Its activities in expending public funds for educational purposes are no less public in character, and thereby subject to the same federal constitutional standards, as are those of a county board of education. As expressed by statute, the Commission exercises responsibility on behalf of the State of Mississippi, jointly with local school districts, "to insure and provide substantial equality of educational opportunity" (Miss.Code Ann. § 6246–01). No state funds can be expended for any purpose without first receiving the approval of the Commission, and the Commission does not approve any application until it finds that the board of trustees of the applying school district shall have adopted and submitted "an acceptable and reasonably satisfactory plan, looking particularly to efficiency through consolidation of school attendance centers".[4]

---

4. Miss.Code Ann. § 6247–05, provides as follows:

"Commission to approve use of funds.— No grants accruing to any school district shall be expended for any purpose unless such expenditure has been approved by the commission. In order to guide the commission in passing upon requests for the use of grants, the county board of education of the respective counties and boards of trustees of municipal separate school districts are directed to prepare a survey of necessary capital improvements and/or a plan for tax relief on school indebtedness within each school district. Such surveys shall show existing facilities, desirable consolidations, the new construction and new facilities necessary and desirable for the efficient operation of the public schools of the school districts

and the plan of tax reduction in the school districts by use of such funds in retiring any outstanding indebtedness for school facilities. The commission shall not approve any application for the use of funds of the said public school building fund from the board of trustees or other governing body of any school district until such time as an acceptable and reasonably satisfactory plan, looking particularly to efficiency through consolidations of school attendance centers, has been submitted by the county board of education or boards of trustees of municipal separate school districts, and all applications from school districts shall conform to the plan of the county board of education, or boards of trustees of municipal separate school districts, as the case may be. * * *"

The local school district is required to submit data of a comprehensive nature for the guidance of the Commission. Although the Commission usually imposes upon a local district primary responsibility for initiating and adopting a satisfactory building-use plan, it has statutory authority to assist a local board of education in making a proper survey and may itself make supplemental surveys of the needs of a particular school district (Miss.Code Ann. § 6246–11).[5] Viewed in any light, the Commission is extensively involved in the business of public school education and is, therefore, not in position to adopt a "hands-off policy" as regards the disestablishment of state-imposed segregation in a public school system. The affirmative obligation to seek means of disestablishing state-imposed segregation must be shared by all agencies, or agents of the state, including Educational Finance Commission, who are charged by law with, and who exercise, official public school functions. Neutrality must be forsaken for an active, affirmative interest in carrying out constitutional commands. Moreover, the Commission is, or may well be placed, in position to be of material aid to a local school district as it confronts complex, future building problems likely to result from the dual challenge presented by the demands of efficiency and desegregation. This court respects the statutory wisdom of imposing upon a local school district the initial burden for adopting and coming forward with a plan of building needs. And while such should here be the primary responsibility of the Quitman County Board of Education, Educational Finance Commission must actively assist the County Board of Education in all reasonable, proper and efficient ways to produce a plan satisfactory both to the County Board of Education and to Educational Finance Commission and consistent, of course, with the views expressed in this opinion. There must be no question about availability of state funds credited to Quitman County School District for use in such impending school construction as may be envisaged by new survey of the County Board of Education and an approved plan resulting therefrom, with respect to expansion of existing schools, construction of new schools, and purchase of land for school sites.

An order is this date entered overruling the dismissal motions of the County Board of Education and Educational Finance Commission and granting injunctive relief in accordance with the views herein expressed.

5. Miss.Code Ann. § 6246–11, provides as follows:
"Duties of Commission.—
Subject to the provisions of any applicable statute, the commission shall formulate policies and approve or disapprove plans for the location and construction of all necessary elementary and secondary school buildings. Subject also to any applicable statute, the commission shall have supervision over, and the power to approve, or disapprove, all surveys of educational needs made by any school board or board of education, may assist such boards in making such surveys, and may make supplemental surveys of such needs."