**Carl C. SMUCK, a Member of the Board of Education of the District of Columbia, Appellant,**

v.

**Julius W. HOBSON et al., Appellees.**

**Carl F. HANSEN, Superintendent of Schools of the District of Columbia, Appellant,**

v.

**Julius W. HOBSON et al., Appellees.**

**Nos. 21167, 21168.**

United States Court of Appeals District of Columbia Circuit.

Argued June 26, 1968.

Decided Jan. 21, 1969.

Mr. E. Riley Casey, Washington, D. C., filed a brief on behalf of the National School Boards Association, as amicus curiae, urging reversal.

Mr. William B. Beebe, Washington, D. C., filed a brief on behalf of the American Association of School Administrators, as amicus curiae, urging reversal.

Messrs. Howard C. Westwood and Albert H. Kramer, Washington, D. C., filed a brief on behalf of the National Education Association, as amicus curiae, urging affirmance.

Messrs. J. Francis Pohlhaus and Frank D. Reeves, Washington, D. C., filed a brief on behalf of the National Association for the Advancement of Colored People, as amicus curiae, urging affirmance.

Before BAZELON, Chief Judge, and DANAHER, BURGER, McGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, sitting *en banc*.

BAZELON, Chief Judge, joined by LEVENTHAL and ROBINSON, Circuit Judges, in Part I; and by McGOWAN, LEVENTHAL and ROBINSON, Circuit Judges, in Parts II, III, and IV:

These appeals challenge the findings of the trial court that the Board of Education has in a variety of ways violated the Constitution in administering the District of Columbia schools.[1] Among the facts that distinguish this case from the normal grist of appellate courts is the absence of the Board of Education as an appellant. Instead, the would-be appellants are Dr. Carl F. Hansen, the resigned superintendent of District schools, who appeals in his former official capacity and as an individual; Carl C. Smuck, a member of the Board of Education, who appeals in that capacity; and the parents of certain school children who have attempted to intervene in order to register on appeal their "dissent" from the order below.

Messrs. John L. Laskey and Edmund D. Campbell, Washington, D. C., with whom Messrs. F. Joseph Donohue and Thomas S. Jackson, Washington, D. C., were on the brief, for appellants.

Messrs. William M. Kunstler, New York City, and Richard J. Hopkins, with whom Mr. James O. Porter, Washington, D. .C., was on the brief, for appellees. Mr. Jerry D. Anker, Washington, D. C., also entered an appearance for appellees.

1. Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967).

The school board's decision not to appeal inevitably adds a quality of artificiality to any proceedings in this Court. But the importance of the constitutional issues as stake requires an examination of whether these appellants should, despite the absence of the protagonist at trial, be given their day in a higher court. Moreover, our reluctance to review an order unchallenged by the principal defendant below is in some measure tempered by the fact that the present appointed school board has been superseded by a new Board of Education elected last fall.[2] The most fundamental considerations demand that this new board should have the fullest discretion permitted by the Constitution to reshape educational policy within the District. This Court cannot ignore the importance of assuring that the new school board should not be straitjacketed by an order not rooted in constitutional requirements. We conclude that the parents were properly allowed to intervene of right in order to appeal those provisions of the decree which curtail the freedom of the school board to exercise its discretion in deciding upon educational policy.

Taking up the contentions advanced by the parents, our disposition is as follows: In Part II of this opinion we consider and reject certain procedural objections. In Part III we affirm on the merits those parts of the District Court's decree that relate to pupil bussing, optional zones and faculty integration. In Part IV we conclude that the District Court's rulings on the track system and on certain aspects of pupil assignment do not materially limit the discretion of the School Board, and that accordingly the parents lack standing to challenge the factual and legal bases underlying these provisions of the decree—a disposition that imports no view by this Court on the merits of the objections tendered by the parents on these issues.

## I. STANDING TO APPEAL

The Board of Education, as a corollary of its decision to accept the order below, directed Dr. Hansen not to appeal. Nevertheless, after his resignation was submitted and accepted by the board, Dr. Hansen noted his appeal as Superintendent of Schools. Whatever standing he might have possessed to appeal as a named defendant in the original suit, however, disappeared when Dr. Hansen left his official position.[3] Presumably because he was aware of this, he subsequently moved to intervene under Rule 24(a) of the Rules of Civil Procedure in order to appeal as an individual. Although the trial judge found several reasons why such intervention should be denied, the motion was granted "in order to give the Court of Appeals an opportunity to pass on the intervention questions raised here * * *."[4] We agree with the reasoning of the trial court as to Dr. Hansen rather than with its result. The original decision was not a personal attack upon Dr. Hansen, nor did it bind him personally once he left office. And while it may or may not be true that but for the decision Dr. Hansen would still be Superintendent of Schools, the fact is that he did resign. He does not claim that a reversal or modification of the order by this Court would make his return to office likely. Consequently, the supposed impact of the decision upon his tenure is irrelevant insofar as an appeal is concerned, since a reversal would have no effect. Dr. Hansen thus has no "interest relating to the property or transaction which is the subject of the action" sufficient for Rule 24(a), and intervention is therefore unwarranted.

We also find that Mr. Smuck has no appealable interest as a member of the Board of Education. While he was in that capacity a named defendant, the

2. District of Columbia Elected Board of Education Act, 82 Stat. 101 (1968).

3. See Snyder v. Buck, 340 U.S. 15, 71 S.Ct. 93, 95 L.Ed. 15 (1950); Davis v. Preston, 280 U.S. 406, 50 S.Ct. 171, 74 L.Ed. 514 (1930).

4. Hobson v. Hansen, 44 F.R.D. 18, 33 (D.D.C.1968).

Board of Education was undeniably the principal figure and could have been sued alone as a collective entity. Appellant Smuck had a fair opportunity to participate in its defense, and in the decision not to appeal. Having done so, he has no separate interest as an individual in the litigation.[5] The order directs the board to take certain actions. But since its decisions are made by vote as a collective whole, there is no apparent way in which Smuck as an individual could violate the decree and thereby become subject to enforcement proceedings.

The motion to intervene by the parents presents a more difficult problem requiring a correspondingly more detailed examination of the requirements for intervention of right. As amended in 1966, Rule 24(a)(2) permits such intervention

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Before its recent amendment Rule 24 (a) contained two subdivisions requiring the petitioner to be "bound by a judgment in the action" or "so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof."[6] As the trial judge pointed out in his decision to grant intervention to the parents, under the pre-amendment cases the task of defining what constitutes an "interest" was typically "subsumed in the questions of whether the petitioner would be bound or of what was the nature of his property interest."[7] The 1966 amendments were designed to eliminate the scissoring effect whereby a petitioner who could show "inadequate representation" was thereby thrust against the blade that he would therefore not be "bound by a judgment," and to recognize the decisions which had construed "property" so broadly as to make surplusage of the adjective.[8] In doing so, the amendments made the question of what constitutes an "interest" more visible without contributing an answer. The phrasing of Rule 24(a) (2) as amended parallels that of Rule 19(a)(2) concerning joinder. But the fact that the two rules are entwined does not imply that an "interest" for the purpose of one is precisely the same as for the other.[9] The occasions upon which a petitioner should be allowed to intervene under Rule 24 are not necessarily limited to those situations when the trial court should compel him to become a party under Rule 19. And while the division of Rule 24(a) and (b) into "Intervention of Right" and "Permissible Intervention" might superficially suggest that only the latter involves an exercise of discretion by the court, the contrary is clearly the case.[10]

The effort to extract substance from the conclusory phrase "interest" or "legally protectable interest" is of limited promise. Parents unquestionably have a sufficient "interest" in the education of their children to justify the initiation of a lawsuit in appropriate circumstanc-

5. *See* Elterich v. Arndt, 175 Wash. 562, 27 P.2d 1102 (1933) ; State ex rel. Erb v. Sweaas, 98 Minn. 17, 107 N.W. 404 (1906).

6. Rule 24(a)(2) and (3), 28 U.S.C.A. (1958).

7. 44 F.R.D. at 22.

8. *See* Notes of Advisory Committee on Rules, Rule 24, 28 U.S.C.A. (1967 Pocket Part).

9. *See* Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 HARV.L.REV. 721, 757–759 (1968).

10. *See id.;* see also Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 HARV.L.REV. 356, 400–407 (1967).

es [11], as indeed was the case for the plaintiff-appellee parents here. But in the context of intervention the question is not whether a lawsuit should be begun, but whether already initiated litigation should be extended to include additional parties. The 1966 amendments to Rule 24(a) have facilitated this, the true inquiry, by eliminating the temptation or need for tangential expeditions in search of "property" or someone "bound by a judgment." It would be unfortunate to allow the inquiry to be led once again astray by a myopic fixation upon "interest." Rather, as Judge Leventhal recently concluded for this Court, "[A] more instructive approach is to let our construction be guided by the policies behind the 'interest' requirement. * * * [T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." [12]

The decision whether intervention of right is warranted thus involves an accommodation between two potentially conflicting goals: to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending. Since this task will depend upon the contours of the particular controversy, general rules and past decisions cannot provide uniformly dependable guides. [13] The Supreme Court, in its only full-dress examination of Rule 24(a) since the 1966 amendments, found that a gas distributor was entitled to intervention of right although its only "interest" was the economic harm it claimed would fol-low from an allegedly inadequate plan for divestiture approved by the Government in an antitrust proceeding. [14] While conceding that the Court's opinion granting intervention in Cascade Natural Gas Corp. v. El Paso Natural Gas Co. "is certainly susceptible of a very broad reading," the trial judge here would distinguish the decision on the ground that the petitioner "did show a strong, direct economic interest, for the new company [to be created by divestiture] would be its sole supplier." [15] Yet while it is undoubtedly true that "Cascade should not be read as a carte blanche for intervention by anyone at any time," [16] there is no apparent reason why an "economic interest" should always be necessary to justify intervention. The goal of "disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process" may in certain circumstances be met by allowing parents whose only "interest" is the education of their children to intervene. In determining whether such circumstances are present, the first requirement of Rule 24(a) (2), that of an "interest" in the transaction, may be a less useful point of departure than the second and third requirements, that the applicant may be impeded in protecting his interest by the action and that his interest is not adequately represented by others.

This does not imply that the need for an "interest" in the controversy should or can be read out of the rule. But the requirement should be viewed as a prerequisite rather than relied upon as a determinative criterion for intervention.

---

11. *See* Pierce v. Society of Sisters, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L. Ed. 1070 (1925).

12. Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694, 700 (1967).

13. For the efforts of one commentator, admittedly only partially successful, to classify the cases in which courts have found a sufficient "interest" for intervention under Rule 24, *see* Shapiro, *supra* note 9, at 729–740.

14. Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 132–136, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967).

15. 44 F.R.D. at 24–25.

16. *Id.* The majority's splenetic displeasure with the substantive provisions of the divestiture plan approved by the Government and the trial court may have been an important factor in the liberal rending given Rule 24(a) in *Cascade*. *See* Shapiro, *supra* note 9, at 729–731; Kaplan, *supra* note 10, at 403–407.

If barriers are needed to limit extension of the right to intervene, the criteria of practical harm to the applicant and the adequacy of representation by others are better suited to the task. If those requirements are met, the nature of his "interest" may play a role in determining the sort of intervention which should be allowed—whether, for example, he should be permitted to contest all issues, and whether he should enjoy all the prerogatives of a party litigant.[17]

Both courts and legislatures have recognized as appropriate the concern for their children's welfare which the parents here seek to protect by intervention.[18] While the artificiality of an appeal without the Board of Education cannot be ignored, neither can the importance of the constitutional issues decided below. The relevance of substantial and unsettled questions of law has been recognized in allowing intervention to perfect an appeal.[19] And this Court has noted repeatedly, "obviously tailored to fit ordinary civil litigation, [the provisions of Rule 24] require other than literal application in atypical cases."[20] We conclude that the interests asserted by the intervenors are sufficient to justify an examination of whether the two remaining requirements for intervention are met.

Rule 24(a) as amended requires not that the applicant would be "bound" by a judgment in the action, but only that "disposition of the action may as a practical matter impair or impede his ability to protect that interest." In Nuesse v. Camp [21] this Court examined a motion by a state commissioner of banks to intervene under the new Rule 24(a) in a suit brought by a state bank against the United States Comptroller of Currency. The plaintiff claimed that the defendant would violate the National Bank Act [22] if he approved the application of a national bank to open a new branch near the plaintiff's office. The intervenor feared an interpretation of the statute which would stand as precedent in any later litigation he might initiate. The Court, agreeing, concluded that "under this new test *stare decisis* principles may in some cases supply the practical disadvantage that warrants intervention as of right." [23] But if a decision interpreting a statute against the applicant's contentions would so handicap him in pursuing a subsequent lawsuit as to justify intervention, the appellants in this case would face a hopeless task in a later suit. The intervening parents assert that the Board of Education should be free to make policy decisions concerning such matters as pupil and faculty assignments without the constraints imposed by the decision below. If allowed to intervene, they hope to show that the past practices condemned by the trial court did not violate the Constitution and hence that the decree should be vacated. Should they succeed, the Board of Education will indeed be freed of certain constraints upon its exercise of discretion in establishing educational policy. But if the right to intervene is denied and the decision below becomes final, there is no apparent way for the parents to pursue their in-

---

17. *Cf.* Shapiro, *supra* note 9, at 740, 752–756.

18. In providing for the first time for an elected school board in the District, Congress has recognized that "the education of their children is a municipal matter of primary and personal concern to the citizens of a community." District of Columbia Elected Board of Education Act § 2, 82 Stat. 101 (1968).

19. *See* Pellegrino v. Nesbit, 203 F.2d 463, 467, 37 A.L.R.2d 1296 (9th Cir. 1953).

20. Textile Workers Union, etc. v. Allendale Co., 96 U.S.App.D.C. 401, 403, 226 F.2d 765, 767 (1955) (en banc), cert. denied, Allendale Co. v. Mitchell, 351 U.S. 909, 76 S.Ct. 699, 100 L.Ed. 1444 (1956), cited in Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694, 700 (1967).

21. 128 U.S.App.D.C. 172, 385 F.2d 694 (1967).

22. 12 U.S.C. § 36 (1964).

23. 128 U.S.App.D.C. at 180, 385 F.2d at 702; *accord*, Atlantis Development Corp. v. United States, 379 F.2d 818, 828–829 (5th Cir. 1967).

terests in a subsequent lawsuit. True, they could assert that the new policies adopted by the Board of Education in compliance with the order below are unconstitutional. But this would be a sterner. challenge than they would face as intervenors here,: although the new policies might not be constitutionally required, they might also not be unconstitutional. Indeed, the very premise for the intervenors' attack on the trial court decision is that school authorities can exercise wide discretion without encountering affirmative constitutional duties or negative prohibitions. While the scope of this discretion is uncertain, its existence is not: some policies may be constitutionally permissible, and hence immune to attack in a fresh lawsuit, which are not constitutionally required. Since this is so, the intervenors have borne their burden to show that their interests would "as a practical matter" be affected by a final disposition of this case without appeal.

The remaining requirement for intervention is that the applicant not be adequately represented by others. No question is raised here but that the Board of Education adequately represented the intervenors at the trial below; the issue rather is whether the parents were adequately represented by the school board's decision not to appeal. The presumed good faith of the board in reaching this decision is not conclusive. "[B]ad faith is not always a prerequisite to intervention,"[24] nor is it necessary that the interests of the intervenor and his putative champion already a party be "wholly 'adverse.' "[25] As the conditional wording of Rule 24(a) (2) suggests in permitting intervention "unless the applicant's interest is adequately rep-

resented by existing parties," "the burden [is] on those opposing intervention to show the adequacy of the existing representation."[26] In this case, the interests of the parents who wish to intervene in order to appeal do not coincide with those of the Board of Education. The school board represents all parents within the District. The intervening appellants may have more parochial interests centering upon the education of their own children. While they cannot of course ask the Board to favor their children unconstitutionally at the expense of others, they like other parents can seek the adoption of policies beneficial to their own children. Moreover, considerations of publicity, cost, and delay may not have the same weight for the parents as for the school board in the context of a decision to appeal. And the Board of Education, buffeted as it like other school boards is by conflicting public demands, may possibly have less interest in preserving its own untrammeled discretion than do the parents. It is not necessary to accuse the board of bad faith in deciding not to appeal or of a lack of vigor in defending the suit below in order to recognize that a restrictive court order may be a not wholly unwelcome haven.

The question of adequate representation when a motion is made for intervention to appeal is related to the question of whether the motion is timely. To a degree it may well be true that a "strong showing" is required to justify intervention after judgment.[27] But by the same token a failure to appeal may be one factor in deciding whether representation by existing parties is adequate.[28] As the opinion of the trial court in granting intervention demon-

24. Hobson v. Hansen, 44 F.R.D. 18, 31 (D.D.C.1968).

25. Nuesse v. Camp, 128 U.S.App.D.C. 172, 181, 385 F.2d 694, 703 (1967).

26. *Id.* at 180, 385 F.2d at 702.

27. *See* United States v. Blue Chip Stamp Co., 272 F.Supp. 432, 435–436 (C.D.Calif. 1967) (collecting cases), aff'd, Thrifty Shoppers Scrip Co. v. U. S., 389 U.S.

580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968).

28. *See* Zuber v. Allen, 128 U.S.App.D.C. 297, 387 F.2d 862 (1967); Pellegrino v. Nesbit, 203 F.2d 463, 37 A.L.R.2d 1296 (9th Cir. 1953); Wolpe v. Poretsky, 79 U.S.App.D.C. 141, 144 F.2d 505, cert. denied, 323 U.S. 777, 67 S.Ct. 69, 91 L.Ed. 627 (1944).

strates, the leading cases in which intervention has been permitted following a judgment tend to involve unique situations.[29] The very absence of any precedent involving the same or even closely analogous facts requires a close examination of all the circumstances of this case. We conclude that the intervenor-appellants here have shown a sufficiently serious possibility that they were not adequately represented in the decision not to appeal.

Our holding that the appellants would be practically disadvantaged by a decision without appeal in this case and that they are not otherwise adequately represented necessitates a closer scrutiny of the precise nature of their interest and the scope of intervention that should accordingly be granted. The parents who seek to appeal do not come before this court to protect the good name of the Board of Education. Their interest is not to protect the board, or Dr. Hansen, from an unfair finding. Their asserted interest is rather the freedom of the school board—and particularly the new school board recently elected[30]—to exercise the broadest discretion constitutionally permissible in deciding upon educational policies. Since this is so, their interest extends only to those parts of the order which can fairly be said to impose restraints upon the Board of Education. And because the school board is not a party to this appeal, review should be limited to those features of the order which limit the discretion of the old or new board.

## II. PROCEDURAL ISSUES

■ Two additional procedural contentions raised by the appellants require attention. The first concerns the severance for trial by a three-judge district court under 28 U.S.C. § 2282 (1964) of the first cause of action stated in the six-count complaint originally filed by the plaintiff-appellees. The appellants argue that since a three-judge court was required for the first count, which challenged the constitutionality of the then-existing statutory regime by which the judges of the United States District Court appointed the members of the Board of Education,[31] the remaining five counts had likewise to be submitted to a three-judge court although they challenged not the statute but only the school board's policies. We find the argument without merit for the reasons outlined by the author of this opinion in denying a motion by the defendants below to expand the jurisdiction of the three-judge court to include counts two through six.[32] The appellants rely chiefly upon Florida Lime & Avocado Growers v. Jacobsen[33] and Zemel v. Rusk.[34] In both those cases, however, the Supreme Court interpreted all of the contentions raised to constitute attacks upon the statutes involved. Success on any score would in each case have prevented enforcement of the statute. In this case, on the other hand, counts two through six were directed only at policies of the Board of Education. The success of the plaintiff-appellees did not and could not call into question the authority of the school board to carry out the responsibilities entrusted to it by the underlying statute, which the three-judge court had meanwhile found constitutional in dismissing count one.[35]

The appellants also contend that the trial judge erred in failing to recuse himself in response to the motion for voluntary displacement filed by the defendants below on the fourteenth day of trial. The motion was supported by exhibits con-

---

29. *See* 44 F.R.D. at 31 & n. 11.

30. *See* District of Columbia Elected Board of Education Act, 82 Stat. 101 (1968).

31. Act of June 20, 1906, ch. 3446, § 2, 34 Stat. 316 (repealed 1968).

32. Hobson v. Hansen, 256 F.Supp. 18 (D.C.1966).

33. 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960).

34. 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

35. Hobson v. Hansen, 265 F.Supp. 902 (D.D.C.1967).

sisting of an article by the trial judge dealing with legal remedies for de facto segregation,[36] an excerpt from the trial transcript purportedly showing that the trial judge had prejudged the merits of the defendants prospective motion for judgment, and articles and editorials in various newspapers and magazines commenting upon the supposed predilections of the trial judge in dealing with the questions of law involved in the case.

■ Even assuming that the motion satisfied the requirements for an affidavit of bias or prejudice under 28 U.S.C. § 144, (1964),[37] there is serious doubt that it was timely. The allegedly improper remarks from the bench—which were in any event of nugatory importance at most—had occurred more than two weeks before. The law review article had been published more than a year before. Since the defendants suggested no "good cause * * * for [their] failure to file it" at the commencement of trial, as the statute requires, we have small difficulty concluding that the trial judge acted properly in denying the motion when made in the midst of a lengthy trial.[38]

III. AFFIRMANCE ON THE MERITS OF RULINGS RELATING TO OPTIONAL ZONES, FACULTY INTEGRATION AND PUPIL BUSSING

The trial court entered a seven-part decree at the conclusion of its lengthy opinion. Its provisions settle under five headings:

(1) *General:* The defendants were "permanently enjoined from discriminating on the basis of racial or economic status in the operation of the District of Columbia school system;"

(2) *Optional Zones:* The defendants were directed to abolish specified optional zones in which pupils could choose which of two schools they wished to attend.

(3) *Faculty Integration:* The defendants were directed (a) to provide for substantial faculty integration in all District schools immediately, and (b) to file with the court a plan for full faculty integration in the future;

(4) *Pupil Assignment:* The defendants were directed (a) to provide transportation for volunteering pupils from overcrowded schools east of Rock Creek Park to schools with excess capacity west of the park, and (b) to submit to the court a long-range plan of pupil assignment to alleviate racial imbalance among District schools; and

(5) *Ability Grouping:* The defendants were directed to abolish the "track system." [39]

■ The general requirement that the Board of Education not discriminate on racial or economic grounds is, of course, no more than declaratory of basic constitutional requirements. The school-board's freedom of discretion which the intervenor-appellants seek to protect is therefore not improperly impaired by that part of the order.

■ As for the optional zones, the trial court found on the basis of a case-by-case evaluation that they had been created in areas where changing residential patterns within the District resulted in white enclaves where normal application of the neighborhood school policy would assign white children to predominantly black schools.[40] These findings are not clearly erroneous, since the trial court's finding that discriminatory intent underlay these zones is supported by the record.[41] The elimination of these optional zones is therefore a clearly appropriate remedy for the segregation flowing from these optional zones. The

36. Wright, Public School Desegregation: Legal Remedies for De Facto Segregation, 40 N.Y.U.L.REV. 285 (1965).

37. *But cf.* Tynan v. United States, 126 U.S.App.D.C. 206, 376 F.2d 761, cert. denied, 389 U.S. 845, 88 S.Ct. 95, 19 L. Ed.2d 111 (1967); Simmons v. United States, 302 F.2d 71, 75 (3d Cir. 1962).

38. *See* Laughlin v. United States, 120 U.S.App.D.C. 93, 99, 344 F.2d 187, 193 (1965).

39. Hobson v. Hansen, 269 F.Supp. 401, 517–518 (D.D.C.1967).

40. *Id.* at 415–417.

41. *Id.* at 499–501.

Board of Education has filed a report of compliance, not yet acted upon by the trial court, stating that all optional zones, including some not mentioned in the opinion of the trial judge, have been abolished.

Those parts of the decree dealing with faculty integration also are premised upon a finding of discriminatory intent. Specifically, the trial court concluded that although black teachers were hired and promoted without bias, "an intent to segregate has played a role in one or more of the stages of teacher assignment." [42] Indeed, the appellants do not challenge the holding that the Board of Education has an affirmative duty to integrate the faculty and administrative personnel of the District schools.[43] Their sole contention is that the "mandatory injunction" requiring compulsory reassignments of present teachers was improper. In so arguing the appellants rely on the belief of Dr. Hansen that such transfers would engender "resentment" among teachers, thereby aggravating the District's already severe problem in attracting qualified teachers, and the recommendation advanced in the task force study of District schools, commonly called the Passow Report,[44] that other devices such as recruitment of new teachers and voluntary transfers of existing teachers should be employed.

We do not read the opinion below to contain any such "mandatory injunction." The actual decree requires only substantial teacher integration immediately and a long-range plan for full faculty integration. In discussing the action that will be necessary to achieve integration, the opinion does note that in addition to such steps as color-conscious assignments of incoming teachers, "this court * * * has no doubt that a substantial reassignment of the present teachers, including tenured staff, will be mandatory." [45] Admittedly these words are ambiguous as to whether compulsory reassignments will at some future date be made mandatory by the court or whether the trial court simply believed that the school board in order to comply with the requirement of eventual full integration will be forced to make mandatory reassignments. But since the actual decree speaks only of integration, and in doing so carefully distinguishes between the need for substantial integration immediately and the long-term requirement for full integration, we believe that the ambiguity should be resolved in favor of the latter construction.

That being so, the words of the opinion reduce to a mere prediction which may be proved incorrect by the success of other tactics in achieving integration. We note that the school board has filed reports detailing the present progress toward faculty integration and its long-term plans to achieve integration. The long-term plan does not include mandatory reassignments, and has not been acted upon by the trial court. The school board has in that report outlined the difficulties of radically shuffling present teachers about the District. In evaluating its arguments, we are confident that the trial judge will assign due weight to the proper considerations of teacher qualifications and the reluctance of teachers residing close to their present schools to travel long distances to a new assignment. Thus we do not construe the decree to preclude consideration of the plight, referred to in the *Passow Report*,

42. *Id.* at 429.

43. *See* Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965).

44. Early in 1965, soon after the filing of this suit, the Board of Education commissioned the Teachers College of Columbia University to undertake a comprehensive study of the District schools.

The results of this study are reported in a 593-page report entitled Toward Creating a Model Urban School System: A Study of the Washington, D.C. Public Schools (September 1967). The volume is popularly known as the *Passow Report* after the study director, Dr. A. Harry Passow.

45. 269 F.Supp. at 516.

of teachers who have previously performed at a satisfactory level in the school system but who do not have requisite ability and background for teaching disadvantaged students.[46] At the same time, regardless of the opinions of Dr. Hansen and the authors of the *Passow Report*, we point out the obvious: racial prejudice on the part of teachers, who are employees of the government, is not a valid justification for continued segregation.

In its most recent term the Supreme Court has made clear that at this late date the remedy for segregatory practices must be prompt. "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." [47] This does not preclude a proper regard for the administrative difficulties of transition to a new day. It does preclude procrastination rooted in racial feelings.

The trial court also ordered the Board of Education to provide transportation for volunteering children in overcrowded schools east of Rock Creek Park to schools with excess capacity west of the park and directed the board to file a long-term plan for pupil assignment "complying with the principles announced in the court's opinion." [48] In doing so the court specifically did not attack the neighborhood school policy in view of its wide use throughout the country and the absence of "segregatory design" in its application in Washington.[49] The trial judge did, however, find a notable inequality of resources and facilities between predominantly black schools and those with a greater admixture of whites.[50] The court also examined in detail the repeated findings by the Supreme Court and others that racially segregated schools harm the black child.[51]

While suggesting that the continuing vestiges of unconstitutional faculty segregation might support the requirement of short-term pupil bussing,[52] the trial court premised this part of its order on the finding that the school board had not shown that the cost of providing such transportation justified the denial of equal educational opportunity resulting from overcrowded and predominantly black schools.[53] Since Dr. Hansen testified in favor of bussing at the pupil's expense to relieve overcrowding, the appellants travel a fine line in arguing that the mere requirement for payment of transportation costs by the school board improperly restrains its freedom of discretion. Indeed, the appellants may well have conceded away their argument in agreeing that overcrowded conditions in some schools cannot justify the failure of the Board of Education to provide kindergartens for all students if it provides them for any.[54]

█ Opinions may differ as to the source and magnitude of differences between the educational opportunities offered by various District schools. But when the differentiating factor is as clear as overcrowding versus excess capacity, we agree with the trial court that transportation to level out pupil density can fairly be required of the school board.

46. *Passow Report* at 7. Likewise we intimate no opinion on the suggestion of the *Passow Report* for programs to recruit white teachers for black schools to achieve better racial balance in school faculties notwithstanding the possibility that such recruitment programs may open the door to accusations that white applicants are being favored over Negroes.

47. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

48. 269 F.Supp. at 517.

49. *Id.* at 515, 519.

50. *Id.* at 436–438.

51. *Id.* at 419–421, 503–506.

52. *Id.* at 502–503.

53. *Id.* at 510–511.

54. One consequence of overcrowding in the schools east of Rock Creek Park was the inability of some of these schools to provide kindergartens for every youngster. *See id.* at 438–439.

IV. Determination that District Court's Rulings in Long-Range Pupil Assignment and Track System Do Not Limit School Board's Discretion to Pursue Educational Goals and to Provide Ability Grouping and that Accordingly Parents Lack Standing to Challenge Underlying Factual and Legal Bases of These Provisions of the Decree

We conclude that the long-range plan of pupil assignment required by the order of the trial court does not trammel the discretion of the school board. The opinion does direct the board to consider such alternatives as educational parks and the Princeton plan.[55] But in the absence of a more specific order this part of the directive is merely precatory. The demonstrated inequalities among Washington schools justifies an order requiring the School Board to consider alternative policies; we cannot believe that the freedom of action the intervenor-appellants seek to protect for the Board of Education need include the freedom to stand pat without engaging in further re-evaluation of assignment policies.

The opinion of the trial court also states,

Where because of the density of residential segregation or for other reasons children in certain areas, particularly the slums, are denied the benefits of an integrated education, the court will require that the plan include compensatory education sufficient at least to overcome the detriment of segregation and thus provide, as nearly as possible, equal educational opportunity to all schoolchildren.[56]

Even aside from the feelings of inferiority engendered by black schools, there is no doubt that education in a ghetto school can fatally limit a child's horizons and fail to prepare him for constructive participation in society. Residential patterns and the heavy concentration of black children in the District public schools may defy the best efforts of the Board of Education to achieve racially balanced schools while these factors persist.[57] The long run solution may lie in a more broadly based school district extending beyond the borders of the District. But such a development is beyond the pale of judicial action. Appellants could have no cause to object to any efforts of the Board of Education to enlist the voluntary cooperation of other school districts. Similarly we cannot see that appellants would have cause, while we still have black schools within the District, or for that matter at any time, to complain about the making of special efforts to prepare disadvantaged students to find their place in a wider world. And we see no realistic basis for saying that the references by the District Court to the need for such efforts operates in fact to curtail the School Board's discretion.

What appellants seek is assurance that a neighborhood school approach may be maintained by the Board. The decree permits retention of the neighborhood school approach where it does not result in relative overcrowding or other inequality of facilities.

Any other comments in the opinion that may be taken as favoring abandonment of the neighborhood school approach have standing only as suggestions advanced for consideration by the Board. The Board has also received suggestions, in the *Passow Report*, for decentralization of the school program into subsystems, with eight community superintendents, and "that the schools be transformed into community schools, collecting and offering the variety of services and opportunities its neighborhood needs." We are not to be taken as approving or disapproving either of

55. *Id.* at 503–511, 515.

56. *Id.* at 515.

57. At the time of the decision below 90 per cent of the students in District public schools were black. *Id.* at 410. Since then the proportion has increased to 92 per cent. Report of Pupil Membership in Regular Day Schools on October 19, 1967, Office of the Statistical Analyst.

these general philosophies. On this appeal this Court is concerned only with the provisions of the decree containing orders that something be done or stopped—and it is our view that these provisions do not improperly encroach on the Board's statutory discretion.

The last provision of the decree below to be considered is the order that the "track system" be abolished. Behind that curt directive lies a welter of facts and conflicting opinions. In theory, the "track system" like any procedure for ability grouping sought to classify students according to their "ability," whether present or potential, and to provide the education best suited to the needs of each individual child. And since any such system is inevitably fallible, the procedure must make adequate provision for review and reassignments. Unfortunately, as the *Passow Report* concluded, "[T]he tracking system was as often observed in the breach as it was in the adherence to any set of basic tenets." [58] The trial court concluded that the excessively rigid separation of students in different classrooms made each track a largely self-contained world; that the education provided in the lower tracks was so watered-down as to be more fairly described as warehousing than as remedial education; that an excessive reliance upon intelligence tests standardized to white middle-classed norms made initial classifications erratic and irrational in terms of the professed goals of the system; and that the schools slighted their duty to encourage students to "cross-track" in individual course selections and to review track assignments in order to make reassignments where initial error or later developments made this appropriate.[59]

The appellants challenge these findings as well as their constitutional significance if valid. And indeed it would be little less than amazing if such an extended analysis of this complex problem produced a limpid pool of unassailable facts. In some cases, as the words of the *Passow Report* suggest, the difficulty lies in the gulf that may separate theory and practice. Thus, the trial court accepted the "general proposition that tests are but one factor in programming students," [60] but went on to conclude that this single factor played a disproportionate role. A keystone of this analysis was the reasoning that while teachers play a major part in the assignment decision, their evaluations of the student will be markedly influenced by his reported test scores. This conviction is certainly shared by many, but, resting as it does in part on beliefs concerning human nature and the pressures of time which beset teachers like judges, the proposition cannot be demonstrated beyond cavil.

Another difficulty lurking in the fact-finding process is the absence of an accepted yardstick to measure the performance of an ability-grouping system. In some cases statistics are ineluctably ambiguous in their import—the fact that only a small percentage of pupils are reassigned may indicate either general adequacy of initial assignments or inadequacy of review. Superintendent Hansen himself appreciated the importance of care in initial assignments and timely reevaluation. When funds became available the school administration improved the track system by providing for the study by a clinical psychologist, referred to by the District Court, of 1,272 students assigned or about to be assigned to the "special academic" or "basic" track. This study revealed almost two-thirds to have been improperly classified.[61] The track system was duly changed so as to require that a psychologist participate prior to assignment

58. *Passow Report* at 17.

59. 269 F.Supp. at 442–492.

60. *Id.* at 475.

61. These statistics, of course, show only that classifications made without psychological testing were inaccurate when re-evaluated on the basis of test results. They do not reveal whether the initial classifications, or prior re-evaluations, were inaccurate from the vantage point of the information then available.

of any child to the "basic" track. The track system, in short, was not static or frozen, but rather a program in flux, which underscores the reality that discontinuance of this system as it happened to exist at a moment in time was not coercive or inhibiting of the school board's discretion in the way feared by the appellants.

The *Passow Report* also made an exhaustive analysis of the operation of the "track system" and like the trial court criticized many aspects of it.[62] This Court would face a difficult task were it necessary to stack each finding of the trial court against the comparable findings of the *Passow Report*. Indeed it may be that the District Court would have made different findings—though possibly it would have entered the same judgment—if the *Passow Report* had been published and made part of the record prior to the issuance of the findings instead of being added to the file and record by a supplementary order.

The decision of this case does not call on us to undertake any formidable survey or analysis. There are, indeed, a number of contentions we do not find it necessary to consider, and we think it appropriate to state so clearly, in order to obviate avoidable misunderstanding of the scope and purport of our ruling in this sensitive area. We do not find it necessary to resolve appellants' broad legal contentions.[63] Nor do we find it necessary to rule on appellants' intermediate legal contentions.[64] Certainly we do not find it necessary to

plunge into a sea of factual contentions and difficult issues of educational policy, such as (a) considering the proper balance, in tailoring educational programs to the ability of the individual student, between the practical need to group children by measurement of presently demonstrated ability and the simultaneous need to assure all students an opportunity to realize their educational potential, (b) considering to what extent verbal tests may be utilized, either as valid predictors of school success, or as indicators of the gaps in skills that must be filled if minority children are to emerge from poverty backgrounds and become effective participants in contemporary American life, and (c) considering to what extent verbal tests must be adjusted or supplemented in the light of available indicators of educational ability not dependent on existing verbal skills.

The intervenors come before this Court only to protect the freedom of the Board of Education to exercise the widest discretion in setting educational policies within the District. The order under challenge directs only that the "track system" be abolished. Moreover, in doing so, the trial court specifically "assumed that * * * [ability] grouping can be reasonably related to the purposes of public education."[65] In compliance with the decree the "track system" as such has been abolished for more than a year. Both the opinion below and the *Passow Report* indicate that changes were continually being made in the process of ability grouping in District

---

62. *Passow Report* at 193–241.

63. Appellants insist that there was no discrimination on account of race, but only differences in track assignment ascribable to the socio-economic and cultural background of the children which appeared even within groups of all black children, whose track assignments paralleled their backgrounds. Appellants also attack the general applicability of the preferred rights doctrine to such issues, and alternatively deny its application in a case where the school administration was making efforts to improve the system.

64. For example, appellants claim that there is nothing in the record to support any criterion, implicit in the District Court's conclusion, from which to conclude that the extent of the "cross-tracking" and inter-track transfers that had in fact developed were not sufficient to establish requisite flexibility. Appellants also submit that even the question of delineating appropriate flexibility is a question for the school board.

65. 269 F.Supp. at 512.

·schools before the decision below was delivered.[66] In light particularly of the detailed recommendations made in the *Passow Report* for change in procedures for ability grouping, we have little if any basis for assuming that the scope of the board's reevaluation would be materially affected by the judicial directive to abolish the "track system." We cannot believe, for example, that appellants would gainsay the simple proposition that a board whose attention was called to problems of the track system—whether by observations of the trial judge, quite apart from any decree, or by the *Passow Report,* or by other sources—could hardly be expected to sit by without making substantial efforts to upgrade the performance of those children whose present verbal skills were low but who had the innate capacity to respond to substantial efforts.

The ruling of the District Court permitting intervention to appellant-parents was prescient, especially in view of the spirit of the Supreme Court's ruling of Flast v. Cohen.[67] The case is unique, there is a clear controversy, and illumination of the issues is in the public interest. The spirit of Flast v. Cohen likewise enjoins us to confine the issues considered on the merits upon this intervention to those issues that have a realistic nexus to the interests and concerns of the appellants as parents of school children, white and black. This Court's ruling is consistent with and not in derogation of the realistic and understandable concerns of the parents that there be adequate scope for ability groupings in the administration of the school system. The District Court made it clear, and in any event this Court's opinion makes it clear, that the decree permits full scope for such ability grouping.

This Court's disposition is not to be taken as in any way indicating indiffer-ence to the expressed concern of appellants that the school board be able to exercise discretion in pursuing the goals of both quality and equality in educational opportunity without restraint attributable to an assertedly unlawful decree. The District Court's decree must be taken to refer to the "track system" as it existed at the time of the decree. It merits reiteration, and it is perfectly clear from the record, that neither the school board nor Superintendent Hansen were satisfied with the track system as it was or desired a freeze in its features. They were aware of the need for changes, and sought necessary funds. Of paramount importance is the fact that the school administration allocated substantial funds for commissioning the *Passow Report.* The significance of that report as a likely prime mover energizing other changes was apparent from the start and can hardly be controverted.

Therefore, the provision of the decree below directing abolition of the track system will not be modified. We conclude that this directive does not limit the discretion of the school board with full recognition of the need to permit the school board latitude in fashioning and effectuating the remedies for the ills of the District school system. This need for according scope and flexibility is heightened by the circumstance that in 1968 the District of Columbia had its first opportunity to elect a school board. This is an area in which Congress has entrusted to the Board of Education—now an elected board—"the control of the public schools of the District of Columbia," [68] and provided that this board "shall determine all questions of general policy relating to the schools." [69] As we have already noted appellants cannot realistically deny that the elected board will wish to address itself to all deficiencies in public education, and to take into account all perti-

---

66. *See, e.g., id.* at 475 & n. 118, 490–491; *Passow Report* at 193.

67. 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

68. 31 D.C.Code § 101(a) (1967).

69. 31 D.C.Code § 103 (1967).

nent analyses, whether in the comments of legislative staffs, the District Court's opinion, the *Passow Report,* perhaps future studies, etc. The problems are complex, and the board's exploration will undoubtedly be extensive. The exploration must be conducted consistently with constitutional requirements, and these in turn are dependent on manageable standards. The simple decree enjoining the "track system" does not interpose any realistic barrier to flexible school administration by a school board genuinely committed to attainment of more quality and equality of educational opportunity. If the District Court should impose an undue restraint on the school board's efforts to improve quality and equality of educational opportunity, such action would, of course, be subject to expeditious correction by this court.

As construed by this opinion, the order entered by the trial court does not require modification to meet any of the challenges that intervenors have standing to raise. However, in view of the change in composition of the school board following from the recent election, it seems appropriate at this juncture to enter an order of remand, rather than a simple affirmance, to make doubly clear that the plans heretofore filed in this cause by the prior board do not foreclose the new board from evolving new programs and orders pertaining to administration of the schools.

So ordered.

## McGOWAN, Circuit Judge:

Congress has explicitly vested in the Board of Education the "control of the public schools of the District of Columbia," and has directed that that body "shall determine all questions of general policy relating to the schools." 31 D.C. Code §§ 101, 103 (1967). Among such "questions of general policy" was surely the one of whether the Board would appeal the decision of the District Court in this case. In a climate of change and re-examination created by the Board's own initiative in commissioning the so-called Passow Report, the Board addressed itself to the major issues of policy underlying the question of whether to appeal. Those issues obviously comprehended much more than the mere legal soundness of the District Court's decision. The Board decided by a vote of 6 to 2 not to appeal. That action, in my view, ended this litigation for appellate purposes, except for such appeals as the Board may elect to take in the future from any further orders of the District Court.

My colleagues agree with me as to appellants Hansen and Smuck. Some of them—enough to constitute with me a majority—have also concluded that the appellant parents are not properly before us with respect to certain portions of the decree. They reach that conclusion by a more tortuous path than I find it necessary to take, but, in respect of intervention, we reach the same result to this limited degree, namely, that there is no one before us with standing to challenge those provisions of the decree which (1) generally enjoin the Board from racial or economic discrimination, (2) require the submission of a pupil assignment plan for the Court's approval, and (3) enjoin the operation of the track system. This result necessarily means that the appeals with respect to these provisions of the decree are dismissed without resolution of their legal merit.

I would do the same with the decree in its entirety. The appellant parents sought to intervene in this litigation only after the Board had decided not to appeal. Their intervention pleadings state as their only reason for seeking this belated entry into the case that they "dissent from" the Board's decision. There are no allegations of any kind that the Board majority was faithless to its trust, or acted corruptly, conspiratorially, or from any improper motivation whatsoever. Their position essentially is that, had they been on the Board, they would have voted differently. I cannot believe that it is either good

law or sound policy to permit intervention under these circumstances solely to enable dissident citizens to prolong a lawsuit against the Board which the Board, in the exercise of its statutory responsibility for the welfare of the schools, has thought it advisable to terminate.

Rule 24(a) (2), FED.R.CIV.P., says that there is to be no intervention if "the applicant's interest is adequately represented by existing parties." The only inadequacy of representation asserted by appellant parents is a policy disagreement with the Board over its decision not to appeal. This policy issue, however, is committed by Congress to the Board, and it is anomalous in the extreme to think that Congress, in accepting the Federal Rules, contemplated that any District resident who did not like the Board's decision to end a lawsuit could second-guess that decision by claiming a right to intervene.

I think the granting of intervention here for any purpose is an unacceptably loose construction of the Federal Rules which, I hope, will not endanger rational principles of judicial administration in other, and less emotional, areas of litigation. Permitting it here is also far from a promising omen for the capacity of the new and, for the first time, popularly-elected Board to keep firmly within its own grasp all important strands of educational policy.

I have from the beginning not thought it necessary to do other with these appeals than to dismiss them.[1] No one of my colleagues has been prepared to embrace this position completely. We are left, then, with the need to dispose of this appeal in some reasonably definitive manner and thereby to foster the desirable objective of moving this litigation along towards its eventual termination. To this end, and for this purpose, I am willing to deal with the merits of those particular provisions of the decree as to which my colleagues are all in agreement that at least some of the appellants have standing. These are (1) the requirement of transportation for students at overcrowded schools who wish to go to under-utilized schools, (2) the abolition of optional zones, and (3) the requirements with respect to teacher integration. These provisions of the decree seem to me consistent with established and authoritative legal doctrines. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358 (1965); Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224 (1965); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950).

I vote to affirm the judgment of the District Court in those respects, and also with reference to the issues dealt with in Part II of Judge BAZELON'S opinion; and to this end I join in Parts II and III of that opinion. Although, as indicated above, I would have found no standing at all, since I am alone in that point of view and concur in the result reached in Part IV, I also join in that part.

---

1. The case authorities do not seem to me to be conclusive on the issue of intervention. This appears quite clearly from the careful review made of them by the District Court in its extended treatment of the issue in its opinion on the motion for intervention, granted solely for the purpose of enabling appellants to be heard on the question here. 44 F.R.D. 18 (1968). There is no point in pursuing that examination further, except to take note of the only case cited by Judge Bazelon which has been decided since the District Court's opinion. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942 (1968), is a significant enlargement of the right of a citizen to bring a suit challenging a federal expenditure. It has nothing to do with the intervention issue presented by this record, except as it is expansively read as meaning that, in any litigation of public interest, anyone can get in at any time. I do not read it that way, nor would, I suspect, the District Court regard its reluctant decision to grant intervention as "prescient" of such a reading.

DANAHER, Circuit Judge, with whom Circuit Judges BURGER and TAMM join, dissenting:

When Congress adopted the "District of Columbia Elected Board of Education Act,"[1] it announced "Findings and Declaration of Purpose," as follows:

The Congress hereby finds and declares that the school is a focal point of neighborhood and community activity; that the merit of its schools and educational system is a primary index to the merit of the community; and that the education of their children is a municipal matter of primary and personal concern to the citizens of a community. It is therefore the purpose of this Act to give the citizens of the Nation's Capital a direct voice in the development and conduct of the public educational system of the District of Columbia; to provide organizational arrangements whereby educational programs may be improved and coordinated with other municipal programs; and to make District schools centers of neighborhood and community life.

Additionally, the Act was made to read explicitly in pertinent part:

The *control* of the public schools of the District of Columbia is vested in a Board of Education to consist of eleven elected members * * *. (Emphasis mine.)

The term of office of an elected member of the new Board is to begin at noon on the fourth Monday in January, 1969, and meetings of the Board are to be open[2] to the public. Specifically, Congress made it proof positive that "no final policy decision * * * may be made by the Board of Education in a meeting * * * closed to the public." It is obvious from the legislative hearings that Congress was quite aware, as assuredly the general public in the District of Columbia well knows, that complex questions had arisen in the administration of the schools in the District. The general awareness became specific following the trial[3] which commenced July 18, 1966 and continued off and on until October 25, 1966. Circuit Judge Wright on June 19, 1967 as trial judge rendered his opinion[4] which incorporated his findings of fact, conclusions of law and a decree.[5]

It seems to me clear that Congress was intent upon the creation of an entirely new entity to which has been delegated the "control" of the public schools of the District of Columbia in furtherance of what might be discerned as the "direct voice" of our District citizens. The situation here is clearly unique and, likely enough, finds no counterpart throughout the nation. There had been widespread dissatisfaction with the administration of our schools through a Board appointed by the District Judges. We ourselves had taken note of the problems and had recognized that we had been confronted with "a very sensitive political question."[6] That discrimination in various forms had been continued for many years or had arisen since May 19, 1954[7] was abundantly establish-

1. P.L. 90–292, 82 STAT. 101, approved April 22, 1968.

2. With certain exceptions not here pertinent.

3. Some 30 witnesses had testified, and more than 450 exhibits had been introduced.

4. Hobson v. Hansen, 269 F.Supp. 401–517.

5. The terms of the decree are set forth in 269 F.Supp. at 517–518.

6. We so observed in the resolution adopted by the Judicial Conference in Executive Session on May 26, 1967, and we asked Congress to lodge the appointive power of members of the Board "elsewhere." See our resolution appearing in Appendix I.

7. The Supreme Court then had decided Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 *and see* Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686 (1954).

ed by Judge Wright's findings in Hobson v. Hansen.[8] The details thus became apparent and the extent of the complexities of the problems confronting the schools in the Nation's Capital can not be doubted. Accentuation of the realities is to be found in what Judge Bazelon has written. All the more on that account I find myself impressed by Judge Wright's "parting word" where as he concludes his opinion he says:

It is regrettable, of course, that in deciding this case this court must act in an area so alien to its expertise. It would be far better indeed for these great social and political problems to be resolved in the political arena by other branches of government.[9]

I agree. It is precisely at this point that I feel the interposition of the judiciary should cease. The evils of de jure segregation have been exposed. The factors which have led some to conclude that de facto segregation has existed have been laid bare. I think—right here—is the place at which we should exercise judicial restraint. Declaratory and injunctive relief had been sought, and Judge Wright had entered his decree. I think that decree should be vacated.

It is fundamental that in circumstances such as here have been disclosed the courts are not bound to grant the relief as prayed. Dr. Hansen as Superintendent of schools had announced his retirement effective as of July 31, 1967. The "old" Board of Education presently will have been supplanted by the Board so recently elected by our citizens. Many of the practices exposed at trial have already been ameliorated, and yet others

may prove impossible of resolution unless the Congress shall become persuaded that funds must be provided. In other aspects, difficulties must be overcome in terms of practicalities which can not be ignored. Transportation problems, new schools, pupil assignments, teacher integration and yet other phases of the situation disclosed in Hobson v. Hansen [10] must be met in accordance with the policy to be formulated by the elected Board acting in furtherance of the purposes of the Act, *supra*.[11]

Undoubtedly in the day and time of it, the issuance of the decree seemed essential in light of Brown v. Board of Education.[12] But now that Congress has spoken and the electorate has acted, a very different status has evolved. Putting aside any effort to achieve in advance of action by the newly elected Board, a definition of judicially manageable standards to bind its execution of the policy entrusted to it, it is enough to say that wrongs have been exposed. The members of that Board have sought election thoroughly acquainted with the myriad problems for which solutions must be sought. It is a matter of judgment on our part, to be sure, but we can not be oblivious to the fact that political considerations and the necessity for compromise and readjustment will have weight as the new Board enters upon its duties.

Merely by way of analogy we may refer to the concluding observation by Mr. Justice Frankfurter in Colegrove v. Green [13]:

The Constitution has left the performance of many duties in our gov-

---

8. *Supra* note 4.

9. 269 F.Supp. at 517.

10. *Supra* note 4.

11. Moreover, § 5 of the Act, *supra* note 1, pertinently provides that
The Board of Education and the Commissioner of the District of Columbia shall jointly develop procedures to assure the maximum coordination of educational and other municipal programs and services in achieving the

most effective educational system and utilization of educational facilities and services to serve broad community needs.

12. 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). But upon whom has the responsibility devolved for compliance with the terms of the decree? The resigned Hansen? The supplanted Board?

13. 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946).

ernmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights.

In short, it is entirely apropos that the court should not enter the stormy [14] thicket. With Mr. Justice Rutledge in *Colegrove*,[15] I think this court now should decline further to exercise its jurisdiction, and the cause should be remanded to the District Court with directions to vacate the decree.[16]

## APPENDIX

### I

*Judicial Conference of the District of Columbia Circuit*

Resolution by the Judges of the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia, in Executive Session of the Judicial Conference for the Circuit, 1967.

## RESOLUTION

WHEREAS, Under the District of Columbia Code (1961) Title 31, Section 101, the Judges of the United States District Court for the District of Columbia are charged with the duty of appointing the members of the Board of Education of the District of Columbia, and

WHEREAS, This duty has rested with the Judges of the United States District Court for the District of Columbia since June 20, 1906, and

WHEREAS, In recent years the appointment of members of the Board of Education has become an extremely controversial question among the citizens of the District of Columbia, and

WHEREAS, The matter of appointing members of the Board of Education is now a very sensitive political question, not in the party sense, but in a broader sense, and

WHEREAS, The Judges of the United States District Court for the District of Columbia feel that they should not be required to act in this political field, and

WHEREAS, The Judges of the United States District Court for the District of Columbia feel that in view of the foregoing, the appointive power of members of the Board of Education should not be in the Judges of the United States District Court for the District of Columbia; now, therefore, be it

RESOLVED, That the Congress of the United States be requested to amend the District of Columbia Code (1961) Title 31, Section 101, to remove the appointive power of members of the Board of Education from the Judges of the United States District Court for the District of Columbia and to lodge said power elsewhere.

Adopted: May 26, 1967.

A true copy:

Teste:

/s/ Nathan J. Paulson
Secretary of the Judicial Conference
of the District of Columbia Circuit

---

14. See news article, Washington Post, December 5, 1968, attached as Appendix II.

15. *Supra* note 13, 328 U.S. at 566, 66 S.Ct. 1198; *and see* Baker v. Carr, 369 U.S. 186, 233, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

16. *Cf.* Mills v. Green, 159 U.S. 651, 653–654, 16 S.Ct. 132, 40 L.Ed. 293 (1895); Chicago Great Western Ry. Co. v. Beecher, 150 F.2d 394, 398 (8 Cir. 1945), cert. denied, 326 U.S. 781, 66 S.Ct. 339, 90 L.Ed. 473 (1946).

APPENDIX

II

IE WASHINGTON POST    *Thursday, Dec. 5, 1968*
*. . . R*

# Hobson to Bypass Mayor and Council

Julius Hobson, militant School Board member-elect, said last night that he plans to deal directly with Congress on requests for District school funds and will bypass the Mayor and City Council when he takes office in January.

"I got 61,000 votes, The Mayor got 1, from President Johnson," Hobson told a group of about 35 at a meeting in the Church of the Redeemer, 14th and Girard Streets ne.

Hobson said that he had called upon education experts across the country to give him advice for the new job. He has asked a Harvard research group to conduct a cost analysis study of the school budget and to develop proposals for changes in the curriculum, he said.

As a first order of business, he said, he intended to see that the Wright decision was carried out to the letter of the law.

(Hobson was the plaintiff in the Wright decision, handed down in June, 1967, which abolished the track system of ability groupings in D.C. schools.)

Hobson said he had asked the New Jersey Council on Constitutional Law to give him a full legal interpretation of the powers of the School Board under the Wright decision, and also how it affects teachers.

Schools Supt. William R. Manning and all present members of the school administration will be given a fair chance, Hobson said, but he indicated that he probably will call for the dismissal of at least two men — John D. Koontz, an assistant superintendent, and Granville Woodson, director of buildings and grounds.

Koontz admitted that he drew school boundary lines to separate blacks from whites in his testimony in the case that led to the Wright decision, Hobson said.

"Men like Koontz have to go," Hobson said.

Hobson said Woodson had a record for not following School Board directives.

Hobson hurled frequent criticisms at Anita Allen, incumbent School Board member and his chief contender for chairman of the new Board.

"I understand she is railroading stuff through. The new Board will have a lot to clean up," he said.

The five new members who were endorsed by the Triple-E committee and Muriel Alexander, who got Hobson's personal endorsement, add up to a "working majority on paper" on the new Board, he explained. "If these people stick to it, we can change the Board of Education," he said. But, he said, he also was prepared to work without an alliance.

BURGER, Circuit Judge (with whom Circuit Judge TAMM joins):

We join in Judge DANAHER'S opinion and his view that sound principles of judicial restraint command that the mandate be vacated assuming, *arguendo*, that a subject so complex and elusive, and so far beyond the competence of judges, would have warranted judicial action in the first instance.

We add a brief comment to underscore what we believe is implicit in the principal opinion, and indeed in Judge DANAHER'S dissent. The holding of the District Court is not affirmed as written *but only as contrued* by four members of this court. Even a cursory reading of the principal opinion reveals that as so construed, the mandate under review is essentially advisory to the former school board which has ceased to exist. As we see it the new school board is at liberty to make such use of it as it desires in much the same way as it may derive useful guidance from the Passow Report.

Several commentators have expressed views which undergird what Judge DANAHER has said as to the need for caution and restraint by judges when they are asked to enter areas so far beyond judicial competence as the subject of how to run a public school system. We have little difficulty taking judicial notice of the reality that most if not all of the problems dealt with in the District Court findings and opinion are, and have long been, much debated among school administrators and educators. There is little agreement on these matters, and events often lead experts to conclude that views once held have lost their validity. The commentary from various sources, including law reviews, tends to supply strong support for Judge DANAHER'S very sound view on the need for judicial restraint. The Harvard Law Review comments:

* * * [T]he limits upon what the judiciary can accomplish in an active role are an additional reason for circumspection, particularly in an area where the courts can offer no easy solutions.

* * * A court applying the *Hobson* doctrine must necessarily resolve disputed issues of educational policy by determining whether integration by race or class is more desirable; whether compensatory programs should have priority over integration; whether equalization of physical facilities is an efficient means of allocating available resources for the purpose of achieving overall equal opportunity. There is a serious danger that judicial prestige will be committed to ineffective solutions, and that expectations raised by *Hobson*-like decisions will be disappointed. Furthermore, judicial intervention risks lending unnecessary rigidity to treatment of the social problems involved by foreclosing a more flexible, experimental approach.

The *Hobson* doctrine can be criticized for its unclear basis in precedent, its potentially enormous scope, and its imposition of responsibilities which may strain the resources and endanger the prestige of the judiciary. * * *

Hobson v. Hansen; *Judicial Supervision of the Color-Blind School Board*, 81 HARV.L.REV. 1511, 1527, 1525 (1968) (footnote omitted).

The Stanford University Law Review had these comments:

It seems to have been the very magnitude of these problems that led the [District] court to search for remedies. In a brief paragraph entitled "Parting Word" the court, anticipating the adverse reaction its substantially unprecedented intervention has indeed provoked, set forth its apologia in these terms:

It is regrettable, of course, that in deciding this case this court must act in an area so alien to its expertise. It would be far better indeed for these great social and political problems to be resolved in the political arena by other branches of government. But these are social and political problems which seem

at times to defy such resolution. In such situations, under our system, the judiciary must bear a hand and accept its responsibility to assist in the solution where constitutional rights hang in the balance.

\* \* \* If at this time, however, such problems seem to "defy" social and political resolution, they are not for that reason more open to resolution by the courts. The responsibility lies first with those whose area of expertise comprehends feasible solutions. Hobson v. Hansen: The De Facto Limits on Judicial Power, 20 STAN.L.REV. 1249, 1267 (1968) (footnotes omitted).

After enumerating a number of objections to the Constitutional underpinnings of a Hobson v. Hansen-type opinion, Professor Kurland of the University of Chicago goes on to state:

And my third point of difficulty with the suggested constitutional doctrine of equality of educational opportunity is that the Supreme Court is the wrong forum for providing a solution. \* \* \*

When we turn to the school desegregation cases, the problem most closely analogous to the one we are considering here, we find a more dismal picture of what must be acknowledged to be the Supreme Court's failure rather than its success. The *New York Times* in its annual educational survey for 1968, thirteen and one-half years after Brown v. Board of Education, suggests that we are hardly any further along the line toward school desegregation than we were in 1954.

The Washington, D.C., example is too much with us. And everything that Judge Skelly Wright can do will not afford an integrated school system for the Nation's capital. All that he can accomplish is to assure that the brighter students receive no better education within the system than the other students.

As I have suggested, it is perhaps because of the fact that local governmental units, especially those located in metropolitan areas, cannot or will not bring about racial desegregation that some are looking to the equal educational opportunity concept to break down the municipal boundaries in order to include suburban areas under the same umbrella as that which covers the slum schools. Absent a reversal of the Court's decision in Pierce v. Society of Sisters, however, the escape route of private education will not be closed. And a reversal of that decision will arouse the opposition not only of the suburbanites but of organized religions as well.

Kurland, *Equal Educational Opportunity: The Limits of Constitutional Jurisprudence Undefined*, 35 U.CHI.L. REV. 583, 592, 594, 595 (1968) (footnotes omitted).

This court—and courts generally—would do well to heed these sobering observations.