DASZKIEWICZ *v.* DETROIT BOARD OF EDUCATION.

1. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—LEGISLA-
TURE—INSTITUTIONS OF HIGHER LEARNING.

Constitutional provision that schools and the means of education
shall forever be encouraged conferred on the State legislature
broad power in establishing both common schools and institu-
tions of higher learning (Const. 1908, art. 11, § 1).

2. SAME—EDUCATION A GOVERNMENTAL CONCERN.

Education is a subject of governmental concern and activity.

3. SAME—BOARD OF EDUCATION—NEGLIGENCE OF OFFICERS—STAT-
UTES.

Neither a school district nor the board of education representing
it can be held liable, in the absence of a statute creating lia-
bility, for injuries or damages caused by the negligence of its
officers, agents, or employees while in the performance of their
duties, because they, in furthering the purposes of education,
are in the exercise of a public or governmental function.

4. SAME—BOARD OF EDUCATION—LIABILITY FOR TORTS.

The duty of providing means of education at the public expense
by building and maintaining schoolhouses and employing
teachers is a purely public duty in the discharge of which a
local board of education, as the State's representative, is
exempt from corporate liability for the faulty construction, or
want of repair, of its school building, or the torts of its
servants employed therein.

5. COLLEGES AND UNIVERSITIES—TUITION FEES—TAXATION—LIABIL-
ITY FOR NEGLIGENCE.

Collection of tuition fees by university medical school operated
by board of education of first class school district, which
represented less than 30 per cent. of the total cost of oper-
ating the school, the balance being raised by taxation, did not
deprive board of its immunity from liability for the negli-
gence of its employees (2 Comp. Laws 1929, §§ 7266, 7273,
7277, 7304, 7306, 7307).

6. SCHOOLS AND SCHOOL DISTRICTS—COLLECTION OF TUITION FEES—IMMUNITY FROM LIABILITY FOR TORTS.

A governmentally sponsored educational institution does not lose its immunity from tort liability by collecting tuition fees to assist in defraying the cost of such institution.

7. SAME—TEST OF GOVERNMENTAL FUNCTION—LIABILITY FOR TORTS.

The test for determining whether a particular activity engaged in by a public corporation, such as a school district's board of education, is purely a governmental function or is proprietary in nature is whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit, and if it is there is no liability for tort of its employees in the performance of an act even though undertaken voluntarily and not under compulsion of statute.

8. COLLEGES AND UNIVERSITIES—TUITION FEES—ADMISSION OF STUDENTS.

Collection of tuition from students at university medical school, operated by board of education of first class school district, and admission of students therein only upon approval by a committee on admissions would not change board's operation of the school from a governmental function to that of a proprietary enterprise (2 Comp. Laws 1929, §§ 7266, 7273, 7277, 7304, 7306, 7307).

9. SAME—NEGLIGENCE—DEATH OF STUDENT.

The board of education of a first class school district which owned and operated a medical school in connection with its university, which charged students tuition fees and admitted them into the school only after approval by a committee, was not liable for alleged negligence of its agents and employees resulting in death of student when he fell down elevator shaft (2 Comp. Laws 1929, §§ 7266, 7273, 7277, 7304, 7306, 7307).

Appeal from Wayne; Callender (Sherman D.), J. Submitted January 14, 1942. (Docket No. 81, Calendar No. 41,709.) Decided March 17, 1942.

Case by John Daszkiewicz, administrator of the estate of Zygfried Daszkiewicz, deceased, against Board of Education of the City of Detroit, a municipal corporation, for damages resulting from his death due to alleged negligence of defendant. Verdict and judgment for defendant. Plaintiff appeals. Affirmed.

*Edmund M. Sloman,* for plaintiff.

*Paul E. Krause* and *Clarence E. Page,* for defendant.

STARR, J.   Defendant, board of education of the city of Detroit, owns and conducts Wayne University, which includes a college of medicine.   Plaintiff's decedent son, 22-years-old, was a sophomore in the college of medicine.   On December 15, 1937, he fell into an elevator shaft located in the medical school building, sustaining injuries which resulted in his death five days later.

Plaintiff began suit to recover damages resulting from the death of his decedent and alleged that defendant was negligent in failing to keep and maintain the automatic elevator in the medical school building and the elevator doors in a safe and proper condition, and in failing to have said elevator and safety devices connected therewith properly inspected.   Defendant's answer denied the charge of negligence; also denied that plaintiff's decedent was free from contributory negligence, and alleged, in substance, that in conducting Wayne University medical school, it was engaged as a State agency in a governmental function and, therefore, was not liable for the negligence of its employees.

The case was tried before a jury.   Plaintiff presented evidence that his decedent son was a member of a class doing experimental work on dogs in the physiology laboratory on the fifth floor of the medical building; that, accompanied by a laboratory assistant, he went in the automatic elevator to the basement where dogs, to be used in the experimental work, were kept in cages; that he obtained a dog and returned to the laboratory; that he decided not to use such dog and asked a classmate named Bronson

to accompany him to the basement to get another dog.  Bronson testified:

"After he (plaintiff's decedent) said that, we went out into the corridor of the laboratory and stood there a second and talked.  They used to take a piece of rope, tie it around the dog's neck so it would act as a leash.  *  *  *  He had it on the rope, and was leading it with his rope.  The dog was nervous and frightened and excited, and it wouldn't mind very well.  *  *  *

"I was standing a little slightly in back of him and to the left side of him and facing him, and Ziggy (plaintiff's decedent) was standing sideways to the elevator door and facing me and we were conversing, and the dog was standing in between us and a little in back of us on a leash.  *  *  *

"The laboratory door is almost directly in front of the elevator.  *  *  *

"I believe that Zygfried pushed the elevator button.

"The elevator is a quiet elevator.  There is an electrical hum that you hear.  How long had we waited after he pushed the button?  I could not say exactly.  It seemed a few moments.  *  *  *

"*Q.*  And what happened then?

"*A.*  Well, as far as I can recall Zygfried reached over with his left hand and just pulled the door open and stepped, and as he stepped I realized that the shaft was dark, and I grabbed him, as he was falling.

"I held on to him, but I had leather heels on, and I slipped, and my one foot slipped into the shaft and I let go.

"If I had held onto him I would have been pulled right with him.

"The elevator swinging closed was what stopped me from going all the way into the shaft.

"*Q.*  Did you think the elevator was there when the door started to open?

"*A.*  Well, I could not say.  All I know was I realized the elevator was not there when the door came open and he had stepped.   *   *   *

"The door of the elevator does not open all itself, it has to be pulled open.

"It was the kind of an elevator that was supposed to open up only when the car was at the floor. *   *   *

"Usually you cannot open the door before the elevator gets to the floor."

On cross-examination Bronson testified:

"He must have pressed the button with his left hand.

"I imagine he was looking at the dog and me at the time he pressed the button.

"I realized that the elevator was not there as he had opened the door.

"He was looking at me and still talking at the time he stepped into the elevator shaft. *   *   *

"*Q.*  Mr. Bronson, I believe you said that when the plaintiff stepped into the shaft that he was looking in the direction of the dog and yourself, is that right?

"*A.*  Yes.

"*Q.*  So he could not see whether or not the elevator was or was not there at the time.

"*A.*  No."

An elevator mechanic, called as a witness by plaintiff, testified that the elevator in the medical school was a "standard automatic elevator," equipped with an electromechanical lock, and that, if the lock was in working condition, the elevator door at a floor could not be opened unless the elevator was at the floor; that he examined the lock on the elevator door the day after the accident. Such witness further testified:

"I found that the fifth floor door could be opened when the elevator was not there. The cause of that was a worn bar. On this particular lock there is what would look like a hooded finger.

"When you close the door this trips down into a steel box, and while it is there it can't be opened if the elevator is not at the floor if it is in proper condition; and this bar that trips down here it had worn so instead of going in so it would hold itself when you pulled against it, it would slip over.
\*    \*    \*

"I found no other cause for that accident outside of the wear on that particular latch. There was no breaking of any part of the mechanism.

"To repair that lock at that time, I filed that lock so it was square, so it wouldn't slide off the catch.
\*    \*    \*

"In my opinion, this was the type of wear that an experienced elevator mechanic or service man could have detected.    \*    \*    \*

"Q. In your opinion, to keep that elevator and its doors in proper operating condition and safe condition, how often should that elevator and those doors be inspected?    \*    \*    \*

"A. I would say once every two weeks by an experienced mechanic."

There was testimony that the elevator had not been regularly inspected; that the last inspection was about four months before the accident; and that two or three days after the accident an entirely new lock was placed on the elevator door.

Defendant's business manager testified that the total cost of operating Wayne University medical school for the year period from July 1, 1937, to June 30, 1938, was $282,712.28, of which $79,052 was collected as tuition fees from students, and the balance of $203,660.28 was raised by taxation; and that

tuition fees collected "go into the general fund of the board of education."

It was admitted that at the time of the accident the deceased's tuition and other fees had been paid.

At the close of all testimony defendant moved for directed verdict on the ground that "the board of education of the city of Detroit, is a State agency performing a governmental function, and as such is not liable for the tortious acts of its agents," and that plaintiff's decedent was guilty of contributory negligence as a matter of law. The court reserved decision on such motion and submitted the case to the jury. The jury returned verdict of no cause of action, on which judgment for defendant was entered. Plaintiff's motion and supplemental motion for new trial were denied, and he appeals.

The court's opinion denying plaintiff's motion for new trial stated, in part:

"The court is obliged to say that if the jury had returned a verdict for the plaintiff and against the defendant, the court would have granted the reserved motion to direct a verdict of no cause of action."

Plaintiff admits that defendant, in operating the public schools of the city of Detroit, including the kindergarten through the twelfth grade, in which all children are admitted to classes and no tuition is charged resident students, is performing exclusively a governmental function and would not be liable for the negligence of its employees in the conduct and operation of such schools. However, plaintiff contends that defendant, in operating Wayne University medical school, *to which tuition is charged and to which students are admitted only upon approval by a committee on admissions,* is not performing a purely governmental function, but is engaged as a *quasi* municipal corporation in a proprietary enter-

prise and is, therefore, liable for the negligence of its employees. Plaintiff's counsel states in his brief:

"A different situation arises in the operation of Wayne University college of medicine. In the first place, regardless of the educational qualifications of an applicant, he is not permitted to attend such college unless his application has first been approved by a committee on admissions consisting of 12 members including the dean of the college, a group of members of which committee interviews the applicant as to his background, antecedents, family and personal history, and, from such examination and investigation of references, either approves the application or rejects the same. The decision of such committee is final. In the second place, even if an applicant has secured the approval of the committee on admissions, his attendance at the college is conditional upon the payment of certain fixed charges and a tuition of at least $94.34 each quarter.

"It is my contention that the defendant in the operation and conduct of such medical college comes within the category of municipal or other *quasi* public corporations, who, under their charters, are permitted to engage in a proprietary enterprise and to charge for services furnished; and, as such, is liable for the negligence of its agents and servants, employed in the conduct or operation thereof."

We cannot agree with plaintiff's contention. The Constitution of Michigan (1908), art. 11, § 1, provides:

"Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

Such constitutional provision conferred on the State legislature broad power in establishing both common schools and institutions of higher learning.

Section 7266, 2 Comp. Laws 1929 (Stat. Ann.
§ 15.254), provides that each school district having
a population of more than 500,000 (the city of De-
troit) shall constitute a school district of the "first
class." Section 7273, 2 Comp. Laws 1929 (Stat.
Ann. § 15.261), provides for the election of a board
of education in a school district of the first class,
and section 7277, 2 Comp. Laws 1929 (Stat. Ann.
§ 15.265), provides that such board of education
"shall be a body corporate."

Section 7304, 2 Comp. Laws 1929 (Stat. Ann.
§ 15.292), provides:

"The board of education of the said first class
(district) may establish or acquire and maintain a
college of the liberal arts and such professional col-
leges as it may deem expedient and may operate
such professional colleges in connection with said
college of liberal arts or separately as it may in
its discretion determine."

We have repeatedly recognized education as a
subject of governmental concern and activity. *Rob-
inson* v. *Washtenaw Circuit Judge*, 228 Mich. 225;
*Daniels* v. *Grand Rapids Board of Education*, 191
Mich. 339 (L. R. A. 1916 F, 468).

In *Trustees of Dartmouth College* v. *Woodward*,
4 Wheat. (17 U. S.) 518, 634 (4 L. Ed. 629), Chief
Justice Marshall said:

"That education is an object of national concern,
and a proper subject of legislation, all admit. That
there may be an institution founded by government,
and placed entirely under its immediate control, the
officers of which would be public officers, amenable
exclusively to government, none will deny."

The law has long been settled in this State that,
in the absence of a statute creating liability, neither
a school district nor the board of education repre-
senting the district can be held liable for injuries
or damages caused by the negligence of its officers,

agents, or employees while in the performance of their duties, because they, in furthering the purposes of education, are in the exercise of a public or governmental function.   *McDonell* v. *Brozo,* 285 Mich. 38; *Robinson* v. *Washtenaw Circuit Judge, supra; Daniels* v. *Grand Rapids Board of Education, supra; Whitehead* v. *Detroit Board of Education,* 139 Mich. 490.   See, also, 66 A. L. R. 1281; 24 A. L. R. 1070; 21 A. L. R. 1328; 14 A. L. R. 1392; 9 A. L. R. 911; 2 Shearman & Redfield on Negligence (6th Ed.), § 267; 14 C. J. S. p. 1348; 28 Cyc. p. 1309.

In *Daniels* v. *Grand Rapids Board of Education, supra,* p. 349, we quoted with approval the following rule:

" 'The duty of providing means of education, at the public expense, by building and maintaining school houses, employing teachers, et cetera, is a purely public duty, in the discharge of which the local body, as the State's representative, is exempt from corporate liability for the faulty construction, or want of repair, of its school building, *or the torts of its servants employed therein.'* "

See, also, authorities cited in *Daniels* v. *Grand Rapids Board of Education, supra,* pp. 349, 350.

Defendant is given express authority by the following statutes to fix "tuition and other charges" and the "standards of admission and scholarship" for Wayne University medical school:

"The board shall have power *to fix tuition and other charges* which in its discretion it may determine advisable to charge in connection with the operation of the college provided for in section 39 * hereof, and may make the rates of tuition for residents of said city different from those for nonresidents thereof. *All funds collected as tuition or other charges shall be credited to and become a part of the funds used for the maintenance of said college.*

* 2 Comp. Laws 1929, § 7304 (Stat. Ann. § 15.292).—Reporter.

"The board shall have power in connection with any college course or any course in higher education which it is or may be authorized to furnish, to delegate to proper officers the power to issue and enforce orders relative to the good government of said school and the discipline and conduct of students. It shall have power *to fix standards of admission* and scholarship.   *   *   *   It shall also have power to make rules and regulations relative to the hours of study and the conduct of students both within and without said schools, relative to matriculation, tuition and expense charges, and anything whatever that may advance the interests of education, the good government and prosperity of said institution, and it may exercise the powers as fully and completely as if said institutions were privately owned and controlled." 2 Comp. Laws 1929, §§ 7306, 7307 (Stat. Ann. §§ 15.294, 15.295).

The tuition fees which defendant collected from students in Wayne University medical school for the year above mentioned represented less than 30 per cent. of the total cost of operating the school. The collection of such tuition was only incidental to the main purpose of the school and did not deprive defendant of its immunity from liability for the negligence of its employees. In *Johnson v. Ontonagon County Road Commissioners,* 253 Mich. 465, 471, Mr. Justice NORTH said:

"Municipal corporations and other governmental agencies when performing a purely governmental function do not lose their immunity from liability for its negligent performance merely because they derive an income therefrom, provided the income is only incidental to the main purpose of so functioning and aimed at covering the cost of the undertaking."

The rule is generally recognized that a governmentally sponsored educational institution does not lose its immunity from tort liability by collecting tuition fees to assist in defraying the cost of such

institution. *Davie* v. *University of California Board of Regents,* 66 Cal. App. 693 (227 Pac. 243); *Nabell* v. *City of Atlanta,* 33 Ga. App. 545 (126 S. E. 905); *Todd* v. *Curators of University of Missouri,* 347 Mo. 460 (147 S. W. [2d] 1063).

The test for determining whether a particular activity engaged in by a public corporation is purely a governmental function or is proprietary in nature is stated in *Gunther* v. *Cheboygan County Road Commissioners,* 225 Mich. 619, 621, as follows:

" 'The underlying test is whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability. That it may be undertaken voluntarily and not under compulsion of statute is not of consequence.' "

See, also, 6 (Rev.) McQuillin on Municipal Corporations (2d Ed.), p. 1057, § 2795.

The collection of tuition from students and the admission of students only upon approval by a committee on admissions did not change defendant's operation of the medical school from a governmental function to that of a proprietary enterprise.

We conclude that defendant, in owning and operating Wayne University college of medicine, was a State agency exercising a purely governmental function and was not liable for the alleged negligence of its agents and employees.

In view of our conclusion, the question of contributory negligence and other questions presented do not require consideration.

The judgment for defendant is affirmed, with costs.

CHANDLER, C. J., and BOYLES, NORTH, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.