Ronald BRADLEY et al., Plaintiffs,

v.

William G. MILLIKEN et al., Defendants,

DETROIT FEDERATION OF TEACH-ERS, LOCAL #231, American Federation of Teachers, AFL–CIO, Defendant-Intervenor,

and

Denise Magdowski et al., Defendants-Intervenors.

Civ. A. No. 35257.

United States District Court, E. D. Michigan, S. D.

Sept. 27, 1971.

Louis R. Lucas, William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., J. Harold Flannery, Paul R. Dimond, Robert Pressman, Cambridge, Mass., Jack Greenberg, Norman J. Chachkin, New York City, E. Winther McCroom, Cincinnati, Ohio, Nathaniel R. Jones, General Counsel, N.A.A.C.P., New York City, for plaintiffs.

Eugene Krasicky, Asst. Atty. Gen., State of Mich., Lansing, Mich., for Frank J. Kelley, Atty. Gen. of Mich.

George E. Bushnell, Jr.,* Miller, Canfield, Paddock & Stone, Detroit, Mich., for Detroit Bd. of Ed.

Theodore Sachs, Rothe, Marston, Mazey, Sachs & O'Connell, P. C., Detroit, Mich., for defendant-intervenor Detroit Federation of Teachers, etc.

Alexander B. Ritchie, Fenton, Nederlander, Dodge & Barris, P. C., Detroit,

* Mr. Bushnell was replaced 12–6–71 by George Roumell, Jr., and Louis D. Beer, Riley & Roumell, Detroit, Mich. A substitution of attorneys for the Detroit Board of Education was formally entered on that date.

Mich., for defendants-intervenors Magdowski and others.

## RULING ON ISSUE OF SEGREGATION

ROTH, District Judge.

This action was commenced August 18, 1970, by plaintiffs, the Detroit Branch of the National Association for the Advancement of Colored People [1] and individual parents and students, on behalf of a class later defined by order of the Court dated February 16, 1971, to include "all school children of the City of Detroit and all Detroit resident parents who have children of school age." Defendants are the Board of Education of the City of Detroit, its members and its former superintendent of schools, Dr. Norman A. Drachler, the Governor, Attorney General, State Board of Education and State Superintendent of Public Instruction of the State of Michigan. In their complaint, plaintiffs attacked a statute of the State of Michigan known as Act 48 of the 1970 Legislature on the ground that it put the State of Michigan in the position of unconstitutionally interfering with the execution and operation of a voluntary plan of partial high school desegregation (known as the April 7, 1970 Plan) which had been adopted by the Detroit Board of Education to be effective beginning with the fall 1970 semester. Plaintiffs also alleged that the Detroit Public School System was and is segregated on the basis of race as a result of the official policies and actions of the defendants and their predecessors in office.

Additional parties have intervened in the litigation since it was commenced. The Detroit Federation of Teachers (DFT) which represents a majority of Detroit Public school teachers in collective bargaining negotiations with the defendant Board of Education, has intervened as a defendant, and a group of parents has intervened as defendants.

Initially the matter was tried on plaintiffs' motion for preliminary injunction to restrain the enforcement of Act 48 so as to permit the April 7 Plan to be implemented. On that issue, this Court ruled that plaintiffs were not entitled to a preliminary injunction since there had been no proof that Detroit has a segregated school system. The Court of Appeals found that the "implementation of the April 7 Plan was thwarted by State action in the form of the Act of the Legislature of Michigan," (433 F.2d 897, 902), and that such action could not be interposed to delay, obstruct or nullify steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amendment.

The plaintiffs then sought to have this Court direct the defendant Detroit Board to implement the April 7 Plan by the start of the second semester (February, 1971) in order to remedy the deprivation of constitutional rights wrought by the unconstitutional statute. In response to an order of the Court, defendant Board suggested two other plans, along with the April 7 Plan, and noted priorities, with top priority assigned to the so-called "Magnet Plan." The Court acceded to the wishes of the Board and approved the Magnet Plan. Again, plaintiffs appealed but the appellate court refused to pass on the merits of the plan. Instead, the case was remanded with instructions to proceed immediately to a trial on the merits of plaintiffs' substantive allegations about the Detroit School System. 438 F.2d 945 (6th Cir. 1971).

Trial, limited to the issue of segregation, began April 6, 1971 and concluded on July 22, 1971, consuming 41 trial days, interspersed by several brief recesses necessitated by other demands upon the time of Court and counsel. Plaintiffs introduced substantial evidence in support of their contentions, including expert and factual testimony, demonstrative exhibits and school board documents. At the close of plaintiffs' case, in chief,

1. The standing of the NAACP as a proper party plaintiff was not contested by the original defendants and the Court expresses no opinion on the matter.

the Court ruled that they had presented a prima facie case of state imposed segregation in the Detroit Public Schools; accordingly, the Court enjoined (with certain exceptions) all further school construction in Detroit pending the outcome of the litigation.

The State defendants urged motions to dismiss as to them. These were denied by the Court.

At the close of proofs intervening parent defendants (Denise Magdowski, et al.) filed a motion to join, as parties 85 contiguous "suburban" school districts —all within the so-called Larger Detroit Metropolitan area. This motion was taken under advisement pending the determination of the issue of segregation.

It should be noted that, in accordance with earlier rulings of the Court, proofs submitted at previous hearings in the cause, were to be and are considered as part of the proofs of the hearing on the merits.

In considering the present racial complexion of the City of Detroit and its public school system we must first look to the past and view in perspective what has happened in the last half century. In 1920 Detroit was a predominantly white city—91%—and its population younger than in more recent times. By the year 1960 the largest segment of the city's white population was in the age range of 35 to 50 years, while its black population was younger and of childbearing age. The population of 0–15 years of age constituted 30% of the total population of which 60% were white and 40% were black. In 1970 the white population was principally aging—45 years—while the black population was younger and of childbearing age. Childbearing blacks equaled or exceeded the total white population. As older white families without children of school age leave the city they are replaced by younger black families with school age children, resulting in a doubling of enrollment in the local neighborhood school and a complete change in student population from white to black. As black inner city residents

move out of the core city they "leap-frog" the residential areas nearest their former homes and move to areas recently occupied by whites.

The population of the City of Detroit reached its highest point in 1950 and has been declining by approximately 169,500 per decade since then. In 1950, the city population constituted 61% of the total population of the standard metropolitan area and in 1970 it was but 36% of the metropolitan area population. The suburban population has increased by 1,978,000 since 1940. There has been a steady out-migration of the Detroit population since 1940. Detroit today is principally a conglomerate of poor black and white plus the aged. Of the aged, 80% are white.

If the population trends evidenced in the federal decennial census for the years 1940 through 1970 continue, the total black population in the City of Detroit in 1980 will be approximately 840,000, or 53.6% of the total. The total population of the city in 1970 is 1,511,000 and, if past trends continue, will be 1,338,000 in 1980. In school year 1960–61, there were 285,512 students in the Detroit Public Schools of which 130,765 were black. In school year 1966–67, there were 297,035 students, of which 168,299 were black. In school year 1970–71 there were 289,743 students of which 184,194 were black. The percentage of black students in the Detroit Public Schools in 1975–76 will be 72.0%, in 1980–81 will be 80.7% and in 1992 it will be virtually 100% if the present trends continue. In 1960, the non-white population, ages 0 years to 19 years, was as follows:

| | | |
|---|---|---|
| 0 – 4 years | 42% |
| 5 – 9 years | 36% |
| 10 – 14 years | 28% |
| 15 – 19 years | 18% |

In 1970 the non-white population, ages 0 years to 19 years, was as follows:

| | | |
|---|---|---|
| 0 – 4 years | 48% |
| 5 – 9 years | 50% |
| 10 – 14 years | 50% |
| 15 – 19 years | 40% |

The black population as a percentage of the total population in the City of Detroit was:

| | | |
|---|---|---|
| (a) | 1900 | 1.4% |
| (b) | 1910 | 1.2% |
| (c) | 1920 | 4.1% |
| (d) | 1930 | 7.7% |
| (e) | 1940 | 9.2% |
| (f) | 1950 | 16.2% |
| (g) | 1960 | 28.9% |
| (h) | 1970 | 43.9% |

The black population as a percentage of total student population of the Detroit Public Schools was as follows:

| | | |
|---|---|---|
| (a) | 1961 | 45.8% |
| (b) | 1963 | 51.3% |
| (c) | 1964 | 53.0% |
| (d) | 1965 | 54.8% |
| (e) | 1966 | 56.7% |
| (f) | 1967 | 58.2% |
| (g) | 1968 | 59.4% |
| (h) | 1969 | 61.5% |
| (i) | 1970 | 63.8% |

For the years indicated the housing characteristics in the City of Detroit were as follows:

| | | |
|---|---|---|
| (a) | 1960 | total supply of housing units was 553,000 |
| (b) | 1970 | total supply of housing units was 530,770 |

The percentage decline in the white students in the Detroit Public Schools during the period 1961–1970 (53.6% in 1960; 34.8% in 1970) has been greater than the percentage decline in the white population in the City of Detroit during the same period (70.8% in 1960; 55.21% in 1970), and correlatively, the percentage increase in black students in the Detroit Public Schools during the nine-year period 1961–1970 (45.8% in 1961; 63.8% in 1970) has been greater than the percentage increase in the black population of the City of Detroit during the ten-year period 1960–1970 (28.9% in 1960; 43.9% in 1970). In 1961 there were eight schools in the system without white pupils and 73 schools with no Ne-gro pupils. In 1970 there were 30 schools with no white pupils and 11 schools with no Negro pupils, an increase in the number of schools without white pupils of 22 and a decrease in the number of schools without Negro pupils of 62 in this ten-year period. Between 1968 and 1970 Detroit experienced the largest increase in percentage of black students in the student population of any major northern school district. The percentage increase in Detroit was 4.7% as contrasted with—

| | |
|---|---|
| New York | 2.0% |
| Los Angeles | 1.5% |
| Chicago | 1.9% |
| Philadelphia | 1.7% |
| Cleveland | 1.7% |
| Milwaukee | 2.6% |
| St. Louis | 2.6% |
| Columbus | 1.4% |
| Indianapolis | 2.6% |
| Denver | 1.1% |
| Boston | 3.2% |
| San Francisco | 1.5% |
| Seattle | 2.4% |

In 1960, there were 266 schools in the Detroit School System. In 1970, there were 319 schools in the Detroit School System.

In the Western, Northwestern, Northern, Murray, Northeastern, Kettering, King and Southeastern high school service areas, the following conditions exist at a level significantly higher than the city average:

(a) Poverty in children
(b) Family income below poverty level
(c) Rate of homicides per population
(d) Number of households headed by females
(e) Infant mortality rate
(f) Surviving infants with neurological defects
(g) Tuberculosis cases per 1,000 population
(h) High pupil turnover in schools

The City of Detroit is a community generally divided by racial lines. Residential segregation within the city

and throughout the larger metropolitan area is substantial, pervasive and of long standing. Black citizens are located in separate and distinct areas within the city and are not generally to be found in the suburbs. While the racially unrestricted choice of black persons and economic factors may have played some part in the development of this pattern of residential segregation, it is, in the main, the result of past and present practices and customs of racial discrimination, both public and private, which have and do restrict the housing opportunities of black people. On the record there can be no other finding.

Governmental actions and inaction at all levels, federal, state and local, have combined, with those of private organizations, such as loaning institutions and real estate associations and brokerage firms, to establish and to maintain the pattern of residential segregation throughout the Detroit metropolitan area. It is no answer to say that restricted practices grew gradually (as the black population in the area increased between 1920 and 1970), or that since 1948 racial restrictions on the ownership of real property have been removed. The policies pursued by both government and private persons and agencies have a continuing and present effect upon the complexion of the community—as we know, the choice of a residence is a relatively infrequent affair. For many years FHA and VA openly advised and advocated the maintenance of "harmonious" neighborhoods, i. e., racially and economically harmonious. The conditions created continue. While it would be unfair to charge the present defendants with what other governmental officers or agencies have done, it can be said that the actions or the failure to act by the responsible school authorities, both city and state, were linked to that of these other governmental units. When we speak of governmental action we should not view the different agencies as a collection of unrelated units. Perhaps the most that can be said is that all of them, including the school authorities, are, in part, responsible for the segregated condition which exists. And we note that just as there is an interaction between residential patterns and the racial composition of the schools, so there is a corresponding effect on the residential pattern by the racial composition of the schools.

Turning now to the specific and pertinent (for our purposes) history of the Detroit school system so far as it involves both the local school authorities and the state school authorities, we find the following:

During the decade beginning in 1950 the Board created and maintained optional attendance zones in neighborhoods undergoing racial transition and between high school attendance areas of opposite predominant racial compositions. In 1959 there were eight basic optional attendance areas affecting 21 schools. Optional attendance areas provided pupils living within certain elementary areas a choice of attendance at one of two high schools. In addition there was at least one optional area either created or existing in 1960 between two junior high schools of opposite predominant racial components. All of the high school optional areas, except two, were in neighborhoods undergoing racial transition (from white to black) during the 1950s. The two exceptions were: (1) the option between Southwestern (61.6% black in 1960) and Western (15.3% black); (2) the option between Denby (0% black) and Southeastern (30.9% black). With the exception of the Denby-Southeastern option (just noted) all of the options were between high schools of opposite predominant racial compositions. The Southwestern-Western and Denby-Southeastern optional areas are all white on the 1950, 1960 and 1970 census maps. Both Southwestern and Southeastern, however, had substantial white pupil populations, and the option allowed whites to escape integration. The natural, probable, foreseeable and actual effect of these optional zones was to allow white youngsters to escape identifiably "black" schools. There had also been an optional zone (eliminated between 1956

and 1959) created in "an attempt . . to separate Jews and Gentiles within the system," the effect of which was that Jewish youngsters went to Mumford High School and Gentile youngsters went to Cooley. Although many of these optional areas had served their purpose by 1960 due to the fact that most of the areas had become predominantly black, one optional area (Southwestern-Western affecting Wilson Junior High graduates) continued until the present school year (and will continue to effect 11th and 12th grade white youngsters who elected to escape from predominantly black South-western to predominantly white Western High School). Mr. Henrickson, the Board's general fact witness, who was employed in 1959 to, *inter alia,* eliminate optional areas, noted in 1967 that: "In operation Western appears to be still the school to which white students escape from predominantly Negro surrounding schools." The effect of eliminating this optional area (which affected only 10th graders for the 1970–71 school year) was to decrease Southwestern from 86.7% black in 1969 to 74.3% black in 1970.

The Board, in the operation of its transportation to relieve overcrowding policy, has admittedly bused black pupils past or away from closer white schools with available space to black schools. This practice has continued in several instances in recent years despite the Board's avowed policy, adopted in 1967, to utilize transportation to increase integration.

With one exception (necessitated by the burning of a white school), defendant Board has never bused white children to predominantly black schools. The Board has not bused white pupils to black schools despite the enormous amount of space available in inner-city schools. There were 22,961 vacant seats in schools 90% or more black.

The Board has created and altered attendance zones, maintained and altered grade structures and created and altered feeder school patterns in a manner which has had the natural, probable and actual effect of continuing black and white pupils in racially segregated schools. The Board admits at least one instance where it purposefully and intentionally built and maintained a school and its attendance zone to contain black students. Throughout the last decade (and presently) school attendance zones of opposite racial compositions have been separated by north-south boundary lines, despite the Board's awareness (since at least 1962) that drawing boundary lines in an east-west direction would result in significant integration. The natural and actual effect of these acts and failures to act has been the creation and perpetuation of school segregation. There has never been a feeder pattern or zoning change which placed a predominantly white residential area into a predominantly black school zone or feeder pattern. Every school which was 90% or more black in 1960, and which is still in use today, remains 90% or more black. Whereas 65.8% of Detroit's black students attended 90% or more black schools in 1960, 74.9% of the black students attended 90% or more black schools during the 1970–71 school year.

The public schools operated by defendant Board are thus segregated on a racial basis. This racial segregation is in part the result of the discriminatory acts and omissions of defendant Board.

In 1966 the defendant State Board of Education and Michigan Civil Rights Commission issued a Joint Policy Statement on Equality of Educational Opportunity, requiring that

"Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities. . . . Each of these situations presents an opportunity for integration."

Defendant State Board's "School Plant Planning Handbook" requires that

"Care in site locations must be taken if a serious transportation problem exists or if housing patterns in an area would result in a school largely segregated on racial, ethnic, or socio-economic lines."

The defendant City Board has paid little heed to these statements and guidelines. The State defendants have similarly failed to take any action to effectuate these policies. Exhibit NN reflects construction (new or additional) at 14 schools which opened for use in 1970–71; of these 14 schools, 11 opened over 90% black and one opened less than 10% black. School construction costing $9,222,000 is opening at Northwestern High School which is 99.9% black, and new construction opens at Brooks Junior High, which is 1.5% black, at a cost of $2,500,000. The construction at Brooks Junior High plays a dual segregatory role: not only is the construction segregated, it will result in a feeder pattern change which will remove the last majority white school from the already almost all-black Mackenzie High School attendance area.

Since 1959 the Board has constructed at least 13 small primary schools with capacities of from 300 to 400 pupils. This practice negates opportunities to integrate, "contains" the black population and perpetuates and compounds school segregation.

The State and its agencies, in addition to their general responsibility for and supervision of public education, have acted directly to control and maintain the pattern of segregation in the Detroit schools. The State refused, until this session of the legislature, to provide authorization or funds for the transportation of pupils within Detroit regardless of their poverty or distance from the school to which they were assigned, while providing in many neighboring, mostly white, suburban districts the full range of state supported transportation. This and other financial limitations, such as those on bonding and the working of the state aid formula whereby suburban districts were able to make far larger per pupil expenditures despite less tax effort, have created and perpetuated systematic educational inequalities.

The State, exercising what Michigan courts have held to be is "plenary power" which includes power "to use a statutory scheme, to create, alter, reorganize or even dissolve a school district, despite any desire of the school district, its board, or the inhabitants thereof," acted to reorganize the school district of the City of Detroit.

The State acted through Act 48 to impede, delay and minimize racial integration in Detroit schools. The first sentence of Sec. 12 of the Act was directly related to the April 7, 1970 desegregation plan. The remainder of the section sought to prescribe for each school in the eight districts criterion of "free choice" (open enrollment) and "neighborhood schools" ("nearest school priority acceptance"), which had as their purpose and effect the maintenance of segregation.

In view of our findings of fact already noted we think it unnecessary to parse in detail the activities of the local board and the state authorities in the area of school construction and the furnishing of school facilities. It is our conclusion that these activities were in keeping, generally, with the discriminatory practices which advanced or perpetuated racial segregation in these schools.

It would be unfair for us not to recognize the many fine steps the Board has taken to advance the cause of quality education for all in terms of racial integration and human relations. The most obvious of these is in the field of faculty integration.

Plaintiffs urge the Court to consider allegedly discriminatory practices of the Board with respect to the hiring, assignment and transfer of teachers and school administrators during a period reaching back more than 15 years. The short answer to that must be that black teachers and school administrative personnel were not readily available in that period. The Board and the intervening defendant union have followed a most advanced and exemplary course in adopting and carrying out what is called the "balanced staff concept"—which seeks to balance faculties in each school with respect to race, sex and experience, with primary

emphasis on race. More particularly, we find:

1. With the exception of affirmative policies designed to achieve racial balance in instructional staff, no teacher in the Detroit Public Schools is hired, promoted or assigned to any school by reason of his race.

2. In 1956, the Detroit Board of Education adopted the rules and regulations of the Fair Employment Practices Act as its hiring and promotion policy and has adhered to this policy to date.

3. The Board has actively and affirmatively sought out and hired minority employees, particularly teachers and administrators, during the past decade.

4. Between 1960 and 1970, the Detroit Board of Education has increased black representation among its teachers from 23.3% to 42.1%, and among its administrators from 4.5% to 37.8%.

5. Detroit has a higher proportion of black administrators than any other city in the country.

6. Detroit ranked second to Cleveland in 1968 among the 20 largest northern city school districts in the percentage of blacks among the teaching faculty and in 1970 surpassed Cleveland by several percentage points.

7. The Detroit Board of Education currently employs black teachers in a greater percentage than the percentage of adult black persons in the City of Detroit.

8. Since 1967, more blacks than whites have been placed in high administrative posts with the Detroit Board of Education.

9. The allegation that the Board assigns black teachers to black schools is not supported by the record.

10. Teacher transfers are not granted in the Detroit Public Schools unless they conform with the balanced staff concept.

11. Between 1960 and 1970, the Detroit Board of Education reduced the percentage of schools without black faculty from 36.3% to 1.2%, and of the four schools currently without black faculty, three are specialized trade schools where minority faculty cannot easily be secured.

12. In 1968, of the 20 largest northern city school districts, Detroit ranked fourth in the percentage of schools having one or more black teachers and third in the percentage of schools having three or more black teachers.

13. In 1970, the Board held open 240 positions in schools with less than 25% black, rejecting white applicants for these positions until qualified black applicants could be found and assigned.

14. In recent years, the Board has come under pressure from large segments of the black community to assign male black administrators to predominantly black schools to serve as male role models for students, but such assignments have been made only where consistent with the balanced staff concept.

15. The numbers and percentages of black teachers in Detroit increased from 2,275 and 21.6%, respectively, in February, 1961, to 5,106 and 41.6%, respectively, in October, 1970.

16. The number of schools by percent black of staffs changed from October, 1963 to October, 1970 as follows:

Number of schools without black teachers—decreased from 41, to 4.

Number of schools with more than 0%, but less than 10% black teachers—decreased from 58, to 8.

Total number of schools with less than 10% black teachers—decreased from 99, to 12.

Number of schools with 50% or more black teachers—increased from 72, to 124.

17. The number of schools by percent black of staffs changed from October, 1969 to October, 1970, as follows:

Number of schools without black teachers—decreased from 6, to 4.

Number of schools with more than 0%, but less than 10% black teachers—decreased from 41, to 8.

Total number of schools with less than 10% black teachers—decreased from 47, to 12.

Number of schools with 50% or more black teachers—increased from 120, to 124.

18. The total number of transfers necessary to achieve a faculty racial quota in each school corresponding to the system-wide ratio, and ignoring all other elements is, as of 1970, 1,826.

19. If account is taken of other elements necessary to assure quality integrated education, including qualifications to teach the subject area and grade level, balance of experience, and balance of sex, and further account is taken of the uneven distribution of black teachers by subject taught and sex, the total number of transfers which would be necessary to achieve a faculty racial quota in each school corresponding to the system-wide ratio, if attainable at all, would be infinitely greater.

20. Balancing of staff by qualifications for subject and grade level, then by race, experience and sex, is educationally desirable and important.

21. It is important for students to have a successful role model, especially black students in certain schools, and at certain grade levels.

22. A quota of racial balance for faculty in each school which is equivalent to the system-wide ratio and without more is educationally undesirable and arbitrary.

23. A severe teacher shortage in the 1950s and 1960s impeded integration-of-faculty opportunities.

24. Disadvantageous teaching conditions in Detroit in the 1960s—salaries, pupil mobility and transiency, class size, building conditions, distance from teacher residence, shortage of teacher substitutes, etc.—made teacher recruitment and placement difficult.

25. The Board did not segregate faculty by race, but rather attempted to fill vacancies with certified and qualified teachers who would take offered assignments.

26. Teacher seniority in the Detroit system, although measured by system-wide service, has been applied consistently to protect against involuntary transfers and "bumping" in given schools.

27. Involuntary transfers of teachers have occurred only because of unsatisfactory ratings or because of decrease of teacher services in a school, and then only in accordance with balanced staff concept.

28. There is no evidence in the record that Detroit teacher seniority rights had other than equitable purpose or effect.

29. Substantial racial integration of staff can be achieved, without disruption of seniority and stable teaching relationships, by application of the balanced staff concept to naturally occurring vacancies and increases and reductions of teacher services.

30. The Detroit Board of Education has entered into successive collective bargaining contracts with the Detroit Federation of Teachers, which contracts have included provisions promoting integration of staff and students.

The Detroit School Board has, in many other instances and in many other respects, undertaken to lessen the impact of the forces of segregation and attempted to advance the cause of integration. Perhaps the most obvious one was the adoption of the April 7 Plan. Among other things, it has denied the use of its facilities to groups which practice racial discrimination; it does not permit the use of its facilities for discriminatory apprentice training programs; it has opposed state legislation which would have the effect of segregating the district; it has worked to place black students in craft positions in industry and the building trades; it has brought about a substantial increase in the percentage of black students in manufacturing and construction trade apprenticeship classes; it became the first public agency in Michigan to adopt and implement a policy requiring affirmative act of contractors with which it deals to insure equal employment opportunities in their work forces; it has been a leader in pioneering

the use of multi-ethnic instructional material, and in so doing has had an impact on publishers specializing in producing school texts and instructional materials; and it has taken other noteworthy pioneering steps to advance relations between the white and black races.

In conclusion, however, we find that both the State of Michigan and the Detroit Board of Education have committed acts which have been causal factors in the segregated condition of the public schools of the City of Detroit. As we assay the principles essential to a finding of de jure segregation, as outlined in rulings of the United States Supreme Court, they are:

1. The State, through its officers and agencies, and usually, the school administration, must have taken some action or actions with a purpose of segregation.

2. This action or these actions must have created or aggravated segregation in the schools in question.

3. A current condition of segregation exists.

We find these tests to have been met in this case. We recognize that causation in the case before us is both several and comparative. The principal causes undeniably have been population movement and housing patterns, but state and local governmental actions, including school board actions, have played a substantial role in promoting segregation. It is, the Court believes, unfortunate that we cannot deal with public school segregation on a no-fault basis, for if racial segregation in our public schools is an evil, then it should make no difference whether we classify it de jure or de facto. Our objective, logically, it seems to us, should be to remedy a condition which we believe needs correction. In the most realistic sense, if fault or blame must be found it is that of the community as a whole, including, of course, the black components. We need not minimize the effect of the actions of federal, state and local governmental officers and agencies, and the actions of loaning institutions and real estate firms, in the establishment and maintenance of segregated residential patterns—which lead to school segregation—to observe that blacks, like ethnic groups in the past, have tended to separate from the larger group and associate together. The ghetto is at once both a place of confinement and a refuge. There is enough blame for everyone to share.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action under 28 U.S.C. §§ 1331(a), 1343 (3) and (4), 2201 and 2202; 42 U.S.C. §§ 1983, 1988, and 2000d.

2. In considering the evidence and in applying legal standards it is not necessary that the Court find that the policies and practices, which it has found to be discriminatory, have as their motivating forces any evil intent or motive. Keyes v. Sch. Dist. #1, Denver, D.C., 303 F.Supp. 279. Motive, ill will and bad faith have long ago been rejected as a requirement to invoke the protection of the Fourteenth Amendment against racial discrimination. Sims v. Georgia, 389 U.S. 404, 407–408, 88 S.Ct. 523, 19 L.Ed.2d 634.

3. School districts are accountable for the natural, probable and foreseeable consequences of their policies and practices, and where racially identifiable schools are the result of such policies, the school authorities bear the burden of showing that such policies are based on educationally required, non-racial considerations. Keyes v. Sch. Dist., *supra*, and Davis v. Sch. Dist. of Pontiac, D.C., 309 F.Supp. 734, and 6 Cir., 443 F.2d 573.

4. In determining whether a constitutional violation has occurred, proof that a pattern of racially segregated schools has existed for a considerable period of time amounts to a showing of racial classification by the state and its agencies, which must be justified by clear and convincing evidence. State of Alabama v. United States, 5 Cir., 304 F. 2d 583.

5. The Board's practice of shaping school attendance zones on a

north-south rather than an east-west orientation, with the result that zone boundaries conformed to racial residential dividing lines, violated the Fourteenth Amendment. Northcross v. Bd. of Ed. of Memphis, 6 Cir., 333 F.2d 661.

6. Pupil racial segregation in the Detroit Public School System and the residential racial segregation resulting primarily from public and private racial discrimination are interdependent phenomena. The affirmative obligation of the defendant Board has been and is to adopt and implement pupil assignment practices and policies that compensate for and avoid incorporation into the school system the effects of residential racial segregation. The Board's building upon housing segregation violates the Fourteenth Amendment. See, Davis v. Sch. Dist. of Pontiac, *supra*, and authorities there noted.

7. The Board's policy of selective optional attendance zones, to the extent that it facilitated the separation of pupils on the basis of race, was in violation of the Fourteenth Amendment. Hobson v. Hansen, D.C., 269 F.Supp. 401, aff'd sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175.

8. The practice of the Board of transporting black students from overcrowded black schools to other identifiably black schools, while passing closer identifiably white schools, which could have accepted these pupils, amounted to an act of segregation by the school authorities. Spangler v. Pasadena City Bd. of Ed., D.C., 311 F.Supp. 501.

9. The manner in which the Board formulated and modified attendance zones for elementary schools had the natural and predictable effect of perpetuating racial segregation of students. Such conduct is an act of de jure discrimination in violation of the Fourteenth Amendment. United States v. School District 151, D.C., 286 F.Supp. 786; Brewer v. School Board of City of Norfolk, 4 Cir., 397 F.2d 37.

10. A school board may not, consistent with the Fourteenth Amendment, maintain segregated elementary schools or permit educational choices to be influenced by community sentiment or the wishes of a majority of voters. Cooper v. Aaron, 358 U.S. 1, 12–13, 15–16, 78 S.Ct. 1401, 3 L.Ed.2d 5.

"A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." Lucas v. 44th Gen'l Assembly of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632.

11. Under the Constitution of the United States and the constitution and laws of the State of Michigan, the responsibility for providing educational opportunity to all children on constitutional terms is ultimately that of the state. Turner v. Warren County Board of Education, D.C., 313 F.Supp. 380; Art. VIII, §§ 1 and 2, Mich. Constitution; Daszkiewicz v. Detroit Bd. of Ed. of City of Detroit, 301 Mich. 212, 3 N.W.2d 71.

12. That a state's form of government may delegate the power of daily administration of public schools to officials with less than state-wide jurisdiction does not dispel the obligation of those who have broader control to use the authority they have consistently with the constitution. In such instances the constitutional obligation toward the individual school children is a shared one. Bradley v. Sch. Bd. of City of Richmond, D.C., 51 F.R.D. 139, 143.

13. Leadership and general supervision over all public education is vested in the State Board of Education. Art. VIII, § 3, Mich. Constitution of 1963. The duties of the State Board and superintendent include, but are not limited to, specifying the number of hours necessary to constitute a school day; approval until 1962 of school sites; approval of school construction plans; accreditation of schools; approval of loans based on state aid funds; review of suspensions and expulsions of individual students for misconduct [Op.Atty.Gen., July 7, 1970, No. 4705]; authority over transportation routes and disbursement of transportation funds; teacher certifi-

cation and the like. M.S.A. 15.1023(1), M.C.L.A. § 388.1001. State law provides review procedures from actions of local or intermediate districts (see M.S.A. 15.-3442, M.C.L.A. § 340.442), with authority in the State Board to ratify, reject, amend or modify the actions of these inferior state agencies. See M.S.A. 15.3467; 15.1919(61); 15.1919(68b); 15.2299(1); 15.1961; 15.3402, M.C.L.A. §§ 340.467, 388.621, 388.628(a), 388.681, 388.851, 340.402; Bridgehampton School District No. 2 Fractional of Carsonville, Mich. v. Supt. of Public Instruction, 323 Mich. 615, 36 N.W.2d 166. In general, the state superintendent is given the duty "[t]o do all things necessary to promote the welfare of the public schools and public educational instructions and provide proper educational facilities for the youth of the state." M.S.A. 15.3252, M.C.L.A. § 340.252. See also M.S.A. 15.2299(57), M.C.L.A. § 388.717, providing in certain instances for reorganization of school districts.

14. State officials, including all of the defendants, are charged under the Michigan constitution with the duty of providing pupils an education without discrimination with respect to race. Art. VIII, § 2, Mich.Constitution of 1963. Art. I, § 2, of the constitution provides:

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."

15. The State Department of Education has recently established an Equal Educational Opportunities section having responsibility to identify racially imbalanced school districts and develop desegregation plans. M.S.A. 15.3355, M.C.L.A. § 340.355, provides that no *school* or department shall be kept for any person or persons on account of race or color.

16. The state further provides special funds to local districts for compensatory education which are administered on a per school basis under direct review of the State Board. All other state aid is subject to fiscal review and accounting by the state. M.S.A. 15.1919. See also M.S.A. 15.1919(68b), providing for special supplements to merged districts "for the purpose of bringing about uniformity of educational opportunity for all the pupils of the district." The general consolidation law M.S.A. 15.3401, M.C.L.A. § 340.401 authorizes annexation for even noncontiguous school districts upon approval of the superintendent of public instruction and electors, as provided by law. Op.Atty.Gen., Feb. 5, 1964, No. 4193. Consolidation with respect to so-called "first class" districts, *i. e.*, Detroit, is generally treated as an annexation with the first class district being the surviving entity. The law provides procedures covering all necessary considerations. M.S.A. 15.3184, 15.3186, M.C.L.A. §§ 340.184, 340.186.

17. Where a pattern of violation of constitutional rights is established the affirmative obligation under the Fourteenth Amendment is imposed on not only individual school districts, but upon the State defendants in this case. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5; Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; U. S. v. State of Georgia, Civ. No. 12972 (N.D. Ga., December 17, 1970), rev'd on other grounds, 5 Cir., 428 F.2d 377; Godwin v. Johnston County Board of Education, D.C., 301 F.Supp. 1339; Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.), aff'd sub. nom., Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422; Franklin v. Quitman County Board of Education, D.C., 288 F.Supp. 509; Smith v. North Carolina State Board of Education, 444 F.2d 6 (4th Cir., 1971).

The foregoing constitutes our findings of fact and conclusions of law on the issue of segregation in the public schools of the City of Detroit.

Having found a de jure segregated public school system in operation in the City of Detroit, our first step, in considering what judicial remedial steps

must be taken, is the consideration of intervening parent defendants' motion to add as parties defendant a great number of Michigan school districts located out county in Wayne County, and in Macomb and Oakland Counties, on the principal premise or ground that effective relief cannot be achieved or ordered in their absence. Plaintiffs have opposed the motion to join the additional school districts, arguing that the presence of the State defendants is sufficient and all that is required, even if, in shaping a remedy, the affairs of these other districts will be affected.

In considering the motion to add the listed school districts we pause to note that the proposed action has to do with relief. Having determined that the circumstances of the case require judicial intervention and equitable relief, it would be improper for us to act on this motion until the other parties to the action have had an opportunity to submit their proposals for desegregation. Accordingly, we shall not rule on the motion to add parties at this time. Considered as a plan for desegregation the motion is lacking in specificity and is framed in the broadest general terms. The moving party may wish to amend its proposal and resubmit it as a comprehensive plan of desegregation.